**The COUNTY OF DAKOTA,**
**Respondent,**

v.

**George W. CAMERON, IV, Appellant.**

**No. A11–1273.**

Court of Appeals of Minnesota.

March 26, 2012.

Review Granted May 30, 2012.

James C. Backstrom, Dakota County Attorney, Michael R. Ring, Assistant County Attorney, Hastings, MN, for respondent.

Daniel Biersdorf, Edward Kelly Keady, Biersdorf & Associates, P.A., Minneapolis, MN, for appellant.

Thomas L. Grundhoefer, Susan Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Jon W. Morphew, Kirk A. Schnitker, Schnitker Law Office, P.A., Spring Lake Park, MN; and Leland J. Frankman, Harry A. Frankman and Bradley J. Gunn, Malkerson, Gunn & Martin, LLP, Minneapolis, MN, for amicus curiae Minnesota Eminent Domain Institute.

Considered and decided by
PETERSON, Presiding Judge; LARKIN,
Judge; and COLLINS, Judge.*

## OPINION

LARKIN, Judge.

In this eminent-domain proceeding, appellant challenges the district court's award of damages under Minnesota's minimum-compensation statute, Minn. Stat. § 117.187. Appellant argues that the district court misconstrued section 117.187 in determining minimum compensation for the taking of his property and that the district court erred in refusing to award him all of the attorney fees that he requested. Because the district court properly construed section 117.187 and awarded appellant just compensation, and because the district court did not err in determining a reasonable award of attorney fees, we affirm.

## FACTS

In 2008, respondent the County of Dakota commenced a condemnation action to acquire various properties in Inver Grove Heights and South St. Paul to provide a right-of-way for reconstruction of County State–Aid Highway 56, also known as Concord Boulevard. One of the properties was owned by appellant George W. Cameron IV. Cameron's property was located at 6566 Concord Boulevard East in Inver Grove Heights (the taken property). The taken property consisted of approximately 13,000 square feet of land and a building that was constructed in 1885. The building had 4,444 square feet of space on the ground level, and a 1,756–square–foot, unfinished basement. The effective date of taking was July 25, 2008.

Cameron is the sole shareholder of Cameron's Warehouse Liquors Inc. Prior to the taking, Cameron's Warehouse Liquors occupied the taken property and sold beer, wine, and liquor under a liquor license issued by the city of Inver Grove Heights. According to Cameron, Cameron's Warehouse Liquors' trade area was on the west side of the Mississippi River within a three-mile radius of the property. After the taking, Cameron's Warehouse Liquors relocated to a temporary location. Although sales have increased at the new location, Cameron's Warehouse Liquors is losing money because expenses are significantly greater at the new location.

The county initially offered Cameron $560,400 for the taken property based on a real-estate appraisal. Cameron rejected the offer. The parties were unable to agree on an award of damages, and the dispute was heard by three court-appointed condemnation commissioners on April 28–30, 2009. At the hearing, the county's appraiser increased his estimate of the fair market value of the taken property to $580,400. The commissioners ultimately awarded Cameron $655,000 in damages. Cameron appealed the commissioners' decision to the district court.

At the ensuing evidentiary hearing in district court, Cameron argued that he was entitled to minimum compensation under Minn.Stat. § 117.187, that is, an amount of money that would enable him to purchase a comparable property in the community. But Cameron's expert testified that no comparable property was available for purchase in the community. Cameron therefore argued that he should be awarded funds sufficient to purchase vacant land and construct a new building comparable to the building on the taken property. Cameron presented a detailed estimate

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

showing that it would cost $2,175,000 to purchase the land and construct a comparable building. Cameron requested damages in that amount.

The county's expert offered evidence regarding his minimum-compensation analysis, which was based on the value of a recently sold liquor store located on South Robert Trail in Inver Grove Heights. The expert opined that the South Robert Trail property was comparable to the taken property. The South Robert Trail property sold for $505,000 in June 2008. Of that amount, $155,000 was compensation for the business and the remaining $350,000 was compensation for the building and land. The expert concluded that because Cameron's property had appraised for more than the South Robert Trail sale price, Cameron was not entitled to minimum compensation and should merely receive the appraised value of his property. Although the county did not advocate a specific amount of compensation at the hearing, it opposed Cameron's request for damages in the amount necessary to purchase land and construct a new building.

The district court determined that the South Robert Trail property was comparable to the taken property. Next, the district court engaged in a market-value analysis based on the sale price of the South Robert Trail property and concluded that Cameron was entitled to $997,055.84 as just compensation. Later, the district court issued an amended order, awarding Cameron $161,964.50 in reasonable attorney fees and $62,006.63 in litigation expenses, appraisal fees, expert fees, and other related costs. Cameron had requested $217,991.45 in attorney fees, which was the actual amount of fees incurred under his attorney-fee agreement. This appeal follows, in which Cameron challenges the damages and attorney-fee awards.

## ISSUES

I. Is Minn.Stat. § 117.187 ambiguous and therefore properly subject to judicial interpretation?

II. Did the district court err in its construction and application of the term "comparable property" under Minn. Stat. § 117.187?

III. Did the district court err in its construction and application of the term "community" under Minn.Stat. § 117.187?

IV. Did the district court err in using a market-value analysis to determine a minimum-compensation award under Minn.Stat. § 117.187?

V. Is the district court's award of $997,055.84 just compensation?

VI. Did the district court err in awarding attorney fees?

## ANALYSIS

### I.

In this case of first impression, we are asked to review the district court's award of minimum compensation under Minn. Stat. § 117.187 in an eminent-domain proceeding. Minn.Stat. § 117.187 states that:

When an owner must relocate, the amount of damages payable, at a minimum, must be sufficient for an owner to purchase a comparable property in the community and not less than the condemning authority's payment or deposit under section 117.042, to the extent that the damages will not be duplicated in the compensation otherwise awarded to the owner of the property.

The statute sets forth a measure of damages that must be utilized when an owner must relocate. "Owner" is defined as "the person or entity that holds fee title to the property." Minn.Stat. § 117.187. The

parties agree that the minimum-compensation statute is applicable in this case because Cameron was the fee owner of the taken property, he suffered a total taking, and he had to relocate his business to continue its operation. Thus, the damages payable must, at a minimum, be sufficient for Cameron "to purchase a comparable property in the community." *Id.*

The parties disagree regarding how minimum compensation is determined under the statute, arguing that the statute is ambiguous and urging this court to resolve the ambiguity through statutory interpretation. The county asserts that the statute "is so vague and ambiguous that reasonably minded persons cannot agree upon its meaning." The district court recognized the purported ambiguity, observing that key terms were left undefined and understandably stating that it hoped "the legislature will revise the minimum-compensation statute to more directly and clearly define the concepts of 'purchase,' 'comparable property,' and 'in the community.' "

We agree that the minimum-compensation statute leaves many questions unanswered, including when an owner must relocate; whether a relocating owner must actually purchase a property to receive minimum-compensation; how "comparable property" should be defined; whether a "comparable property" may be a recently sold property or must be one that is available for purchase; how "community" should be defined; whether minimum compensation should be calculated using a traditional market-value analysis; and, if there is no "comparable property" in the community, whether damages should be based on the amount that it would cost to construct an identical property in the community.

The parties have presented more than one reasonable interpretation of the minimum-compensation statute in an attempt to answer these questions. We therefore conclude that the statute is ambiguous and that statutory interpretation is appropriate. *See Brayton v. Pawlenty,* 781 N.W.2d 357, 363 (Minn.2010) ("[I]f a statute is ambiguous, [appellate courts] apply canons of construction to discern the Legislature's intent."); *Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn. 2000) ("[An appellate court] first look[s] to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." (quotation and citation omitted)). But we limit our de novo interpretation to only those issues that are necessary to our review of the district court's damages award in this case: the definition of "comparable property," the definition of "community," and the damages-calculation method. *See Lee v. Fresenius Med. Care, Inc.,* 741 N.W.2d 117, 122 (Minn.2007) ("Statutory construction is . . . a legal issue reviewed de novo.").

## II.

We begin by defining the term "comparable property" under the minimum-compensation statute. Cameron argues that a comparable property "must be a specific, existent property, which the displaced owner can actually purchase, as opposed to a non-existent hypothetical property." Cameron contends that the legislature intended that the displaced owner would be able to relocate to the comparable property and that "[s]uch an intent can only be fulfilled when an actual property is identified which will accommodate the relocation." Cameron therefore argues that "a comparable property cannot be a property that has already been sold as of the date of taking."

Cameron's argument is not persuasive for several reasons. We first observe that

Cameron's interpretation is inconsistent with his assertion that a displaced owner is not required to purchase a substitute property in order to obtain minimum-compensation damages. Cameron asserts that "an owner can keep the fair market compensation ... and do nothing." Assuming, as Cameron argues, that he is not required to purchase a replacement property to obtain damages under the minimum-compensation statute,[1] there is no need to limit the universe of comparable properties to only those properties that are available for purchase.

We next observe that Cameron's proposed definition of "comparable property" is based on his assertion that the legislature intended to guarantee a displaced business owner's purchase of a replacement property that would allow continued operation of his or her business. We reject this construction for two reasons. First, although Cameron generally alleges that an anti-government-taking atmosphere followed the United States Supreme Court's decision in *Kelo v. City of New London, Conn.*, 545 U.S. 469, 489–90, 125 S.Ct. 2655, 2668, 162 L.Ed.2d 439 (2005) (holding that the city's exercise of eminent-domain power in furtherance of an economic development plan satisfied the constitutional "public use" requirement), and suggests that the 2006 passage of the minimum-compensation statute was a result of that atmosphere, he does not cite to anything in the legislative record or history of the minimum-compensation statute to support his assertion regarding legislative intent. Nor does our thorough review of the legislative history of the minimum-compensation statute reveal a legislative intent to guarantee the purchase of a replacement property, or, as Cameron argues, the continued operation of a displaced business. In fact, the legislature's concurrent passage of what is now Minn. Stat. § 117.186 (2010), which provides for loss-of-going-concern[2] compensation when a business or trade is destroyed by a taking, indicates that the legislature recognized that relocation and continuation of a displaced business may not always be possible. In sum, our review of the legislative history of the minimum-compensation statute, combined with the legislature's contemporaneous enactment of Minn.Stat. § 117.186, reveals that, although the legislature intended to increase the damages award to enable a displaced owner of property to purchase a comparable property in the community, the legislature nevertheless recognized that relocation may not be possible. *See* Minn.Stat. § 117.186; *see also Schroedl*, 616 N.W.2d at 277 ("We are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations.").

Cameron's proposed construction of the term "comparable property" is also unpersuasive because it is unreasonable. *See* Minn.Stat. § 645.17 (2010) (stating that, in ascertaining legislative intent, courts presume that the legislature does not intend results that are "absurd, impossible of execution, or unreasonable"); *Coop. Power Ass'n v. Aasand*, 288 N.W.2d 697, 701 (Minn.1980) (stating that, in order to survive review, "a requirement of reasonableness must be read into" the terms of a statute). There are numerous reasons

---

1. Because this issue is not disputed in this appeal, we need not address whether, or to what degree, Cameron's assumption is accurate.

2. Loss-of-going-concern damages are not at issue here because, at the time of the evidentiary hearing, Cameron's Warehouse Liquors continued to operate at a new location and Cameron did not request loss-of-going-concern damages.

why the purchase of a replacement property may not be possible even though a comparable property is available for purchase in the community. Although the legislature may reasonably require an award of damages sufficient to purchase a property—assuming that a purchase can be finalized—the legislature cannot reasonably guarantee consummation of the purchase. And because the legislature cannot guarantee completion of a purchase, we reject Cameron's argument that a comparable property must be an existing property that is available for purchase. We instead define "comparable property" according to its common usage.

■ When a word or phrase is undefined we follow the general rule that "words and phrases are construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a special meaning, or are defined in chapter [645], are construed according to such special meaning or their definition." Minn.Stat. § 645.08(1) (2010). "Comparable" is commonly defined as "similar or equivalent." *American Heritage Dictionary of the English Language* 384 (3rd ed.1992). And the term "comparable property" is commonly used in other contexts. For example, when utilizing the comparable-sales approach to real-estate valuation "in estimating and determining the value of lands for the purpose of taxation," the appraiser must "consider and give due weight to lands which are comparable in character, quality, and location, to the end that all lands similarly located and improved will be assessed upon a uniform basis and without discrimination." Minn. Stat. § 273.12 (2010). Upward or downward adjustments are regularly made to account for property differences, including age and size. *See, e.g., McNeilus Truck & Mfg. Inc. v. Cnty. of Dodge,* Nos. C2–04–

248, CV–05–357, CV–06–11, 2006 WL 3155657, at *5 (Minn.Tax Ct. Oct. 31, 2006). Consistent with this approach, in identifying a comparable property under the minimum-compensation statute, one should consider land size, features, and location; the square footage, age, design, and construction quality of any structures on the land; as well as features related to the property's usage.

■ The district court determined that the South Robert Trail property is comparable to the taken property because it had "similar effective age, condition, quality, and parking/landscaping." The district court also noted that both properties were used to house liquor stores. Cameron argues that despite these similarities, the South Robert Trail property is not comparable because "it is too small." But the district court acknowledged that the South Robert Trail property is significantly smaller than the taken property, and, as discussed in section IV, appropriately accounted for the size difference. In sum, the district court did not err in determining that the South Robert Trail property was a comparable property under the minimum-compensation statute.

### III.

■ We next define the term "community" under the minimum-compensation statute. Cameron argues that the "community" in this case is Cameron's Warehouse Liquors' trade area, which is "a three mile radius on the west side of the Mississippi River." The district court rejected this argument, concluding that the South Robert Trail property can "fairly be regarded as being in the same community for purposes of the statute, regardless of whether the South Robert Trail property lies within Cameron's trade area." Cameron suggests that the district court erred because all of the witnesses testified that

his trade area constitutes the "community." We disagree that the evidentiary record compels any conclusion regarding the definition of the term "community." "The appropriate definition of a statutory term is a legal conclusion." *Thomas v. W. Nat'l Ins. Grp.*, 543 N.W.2d 712, 714 (Minn.App. 1996), *aff'd,* 562 N.W.2d 289 (Minn.1997). In making a legal conclusion, a court may rely on arguments of counsel and evidence supporting those arguments, but the court is not bound to adopt the opinions of the witnesses when defining statutory terms.

Moreover, Cameron's proposed definition is limited to the commercial-property context, whereas the language of the minimum-compensation statute is not limited to commercial-property takings. Discussions at the relevant legislative hearings indicated that the legislature intended the statute to apply in both residential and commercial contexts. Hearing on S.F. No. 2750 Before the S. Judiciary Comm. (Mar. 9, 2006). Because the legislature did not limit application of the minimum-compensation statute to commercial-property takings, we will not construe the statute as if it had. Instead, we define "community" in a way that has meaning in both residential and commercial contexts, and therefore reject Cameron's trade-area definition because it is meaningless in the residential-property context. And because the term "community" is not technical, we define it according to its common usage. *See* Minn. Stat. § 645.08(1) (stating that undefined, nontechnical words and phrases are construed according to rules of grammar and according to their common and approved usage).

■ Community is commonly defined as "[a] group of people living in the same locality and under the same government." *American Heritage Dictionary of the English Language* 383 (3rd ed.1992). Under this common-usage definition, a determination of the relevant community inevitably will be fact dependent. The district court concluded that the South Robert Trail property is in the same community as the taken property because both properties are located in Inver Grove Heights. The district court stated:

> While location in the same city might not be significant or dispositive as to 'community' in a large city such as St. Paul, with a population of hundreds of thousands, it does not seem particularly out of line to make that connection in a suburb of 30,000 people such as Inver Grove Heights.

■ The district court's reasoning is sound. If the subject property is located in a smaller municipality, the municipality may be the community. But if the property is located in a large metropolitan area, the community may be a neighborhood or geographic area within the metropolis.

■ We recognize that the district court defined "community" as "meaning a location where a business can survive and be profitable," and that this definition is inconsistent with the common-usage definition adopted by this court. But the district court's ultimate conclusion that the South Robert Trail property is within the community is correct under the definition adopted herein. Thus, any district court error in construing the term is not a basis for reversal. *See* Minn. R. Civ. P. 61 (stating that "any error or defect in the proceedings which does not affect the substantial rights of the parties" must be disregarded). In sum, because the district court's conclusion that the South Robert Trail property is in the same community as the taken property is consistent with the common-usage definition of community, the district court's conclusion is not erroneous.

## IV.

Having defined the terms "comparable property" and "community" according to their common usage, we next consider the method by which a damages award is calculated under the minimum-compensation statute; that is, how does one determine an amount that is sufficient to purchase a comparable property in the community? Cameron contends that this amount must be based on one of two figures: the purchase price of a comparable property in the community; or, if no such property exists, the cost to construct a comparable property in the community with no allowance for depreciation.[3] Cameron argues that "a purchase price . . . is the basis for determining damages" under the minimum-compensation statute and that the district court erred in using a "valuation methodology" to determine damages, asserting that "[t]his is not a market value case. This is a minimum compensation case."

■ Cameron's argument that the measure of damages must be based on the list or offer price of a comparable property in the community that is available for purchase is based on a premise that we have rejected, namely, that the minimum-compensation statute guarantees the purchase of a replacement property. Because the statute does not guarantee a purchase, we discern no reason to require that the damages calculation be based on the list or offer price of a comparable property that is available for purchase at the time of the taking. Although the list or offer price may be an appropriate consideration when a comparable property in the community is available for purchase at the time of the taking, it is not the only basis for a damages calculation under the minimum-compensation statute.

■ A market-value analysis is traditionally used to determine just compensation in an eminent-domain case. *See Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 876 (Minn.2010) ("[A] condemning authority must give the property owner a full and exact equivalent for the property taken. This equivalent is usually the market value of the property at the time of the taking contemporaneously paid in money." (quotations and citations omitted)). We discern no reason not to rely on traditionally utilized market-value approaches when determining damages under the minimum-compensation statute. But instead of determining the market value of the taken property, the focus shifts to the market value of comparable properties in the community.

■ "To determine the fair market value of property in a condemnation proceeding any competent evidence may be considered, if it legitimately bears upon the market value." *Cnty. of Ramsey v. Miller*, 316 N.W.2d 917, 919 (Minn.1982) (quotation omitted). "The measure of compensation is the amount which a purchaser willing, but not required, to buy the property would pay to an owner willing, but not required, to sell it, taking into consideration the highest and best use to which the property can be put." *Id.* "[C]ourts have traditionally used three methods of determining fair market value of real property: (1) market data approach based on comparable sales; (2) income-capitalization approach; and (3) reproduction cost, less depreciation." *Id.* "Artificial rules of evidence which exclude from the

---

3. Because we conclude that the district court correctly determined that the South Robert Trail property is a comparable property in the community, we do not address Cameron's arguments regarding application of the minimum-compensation statute when no such property exists.

consideration of the jurors matters which men consider in their everyday affairs hinder rather than help them at arriving at a just result." *Id.* at 921 (quotation omitted). "In no branch of the law is it more important to remember this, than in cases involving the valuation of property, where at best, evidence of value is largely a matter of opinion." *Id.* (quotation omitted).

■ After determining that the South Robert Trail property was a comparable property in the community, the district court utilized a market-data approach to determine minimum compensation, utilizing the sale price of the South Robert Trail property. In doing so, the district court recognized that the South Robert Trail property was significantly smaller than Cameron's taken property: the main-floor square footage of the South Robert Trail property was 1,560 square feet and the main-floor square footage of Cameron's property was 4,444 square feet. The district court reasoned that "[s]ince the South Robert Trail property has considerably less main floor space than the Cameron property, the figures from [the South Robert Trail] sale will need to be extrapolated to determine a suitable award in this case." The district court divided the $350,000 building-and-land purchase price of the South Robert Trail property by the property's 1,560 main-floor square footage and concluded that the property sold for $224.36 per main-floor square foot. The district court declined to adopt certain adjustments that an appraiser had made to the price-per-square-foot calculation, such as land-to-building ratios, reasoning that such adjustments were inconsistent with "the interests of equity and justice." The district court concluded that the "unadjusted price per square foot more accurately reflects [the] reality" that Cameron was not "voluntarily looking for a place to move his business." The district court multi-

plied the $224.36 main-floor-square-foot price of the South Robert Trail property by 4,444, the main-floor square footage of the taken property, for a total of $997,055.84, which is the amount it awarded as minimum compensation.

■ Cameron argues that the district court erred in using this extrapolation method to account for the size difference between the two properties. We disagree. Although the statute does not specifically authorize this process, it is consistent with traditional market-value analysis. For example, "[t]he comparable sales method attempts to value a property by comparing the recent arm's length sales prices of similar properties and then adjusting those sales prices for differences between the sold property and the subject property." *Kmart Corp. v. Cnty. of Becker,* 709 N.W.2d 238, 240 (Minn.2006).

Cameron also argues that the district court's use of the 4,444 square foot figure in its extrapolation is erroneous because his property contained 6,200 square feet: 4,444 square feet on the main floor and 1,756 square feet in the basement. But the district court's price-per-square-foot calculation is based on the main-floor square footage of the South Robert Trail property and not on its total square footage. As the district court explained, it would have been inappropriate to multiply the South Robert Trail main-floor-square-foot price by the total square footage of the taken property. The district court further explained that if it had based its extrapolation on the total square footage of the taken property, the district court would have calculated the South Robert Trail price per square foot based on that property's total square footage. In which case, the price per square foot would have been $112.18 (i.e., the $350,000 South Robert Trail sale price divided by the property's total square footage of 3,120) and

Cameron's award would have been $695,516 (i.e., $112.18 multiplied by 6,200 square feet), which is substantially less than the district court's award. The district court stated that it "gave Cameron the benefit of the doubt by using the more advantageous 'price per main floor square foot' approach."

Lastly, Cameron argues that the record does not provide support for the district court's extrapolation method. Cameron asserts that if this extrapolation had been undertaken by an appraiser, "it would be considered a 'back of a napkin' appraisal with no analysis and a total lack of credibility." But the district court had to base its decision on the evidence presented by the parties. *See Eisenschenk v. Eisenschenk*, 668 N.W.2d 235, 243 (Minn.App. 2003) ("[A] party cannot complain about a district court's failure to rule in [the party's] favor when one of the reasons it did not do so is because that party failed to provide the district court with the evidence that would allow the district court to fully address the question."), *review denied* (Minn. Nov. 25, 2003). And as explained in section V, the district court concluded that neither the appraised value of the taken property nor Cameron's proposed new construction costs would constitute just compensation. Once the district court rejected these alternatives, it had no choice but to fashion a remedy based on the evidence submitted by the parties. Because the resulting extrapolation was based on evidence presented at the hearing, because it was adequately explained by the district court, and because Cameron has not otherwise shown it to be defective, we conclude that it was not erroneous. *See 444 Lafayette, LLC v. Cnty. of Ramsey*, 811 N.W.2d 106 (Minn.2012) (stating that "when the tax court rejects the testimony of both appraisers, that court must indicate one way or another the basis for its calculations and must provide an ade-

quate explanation and factual support in the record for its conclusions" (quotation omitted)). In sum, the district court properly relied on recent sales data regarding the South Robert Trail property to determine damages under the minimum-compensation statute.

## V.

■■■■ Having determined that the district court did not err in its calculation of the damages award, we now consider whether the award is just compensation. "A state's ability to use eminent domain to take an individual's property is an awesome power." *Anda*, 789 N.W.2d at 875. "Both the United States and Minnesota Constitutions limit this sovereign power, requiring a public purpose and a payment of just compensation to the property owner for each taking." *Id.* at 876. The Fifth Amendment to the United States Constitution provides that private property shall not be "taken for public use, without just compensation." U.S. Const. amend. V. The Minnesota Constitution states that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. The supreme court has "observed that because a constitutional provision for just compensation was inserted for the protection of the citizen, it ought to have a liberal interpretation, so as to effect its general purpose." *Anda*, 789 N.W.2d at 876 (quotation omitted).

> Although condemnation awards are usually based on the fair market value of the property in whatever condition the property is at the time of the taking, the constitutional standard that courts must adhere to is 'just compensation.' Courts can be fluid in the standards they apply to determine 'just compensation' when fairness so requires.

When market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards. Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is "just" *both to an owner whose property is taken and to the public that must pay the bill?*

*Id.* (emphasis added) (quotation omitted). "The word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity.'" *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950).

The district court appropriately considered constitutional precedent in determining that $997,055.84 in damages is just compensation. The district court's order is supported by a well-reasoned memorandum that explains the court's analysis. The district court observed that it was involved in a "delicate balancing act." The court considered that Cameron's building was 124 years old and "exhibited wear, tear, and maintenance issues commensurate with its age." The district court also recognized that Cameron "enjoyed a loyal customer base, was apparently content where he was, and had no intention of moving his business." The district court reasoned that "for no other reason than his property being taken through eminent domain, Cameron is forced to bear the costs of obtaining a new location for his business and complying with code and zoning." The district court concluded that "the mere payment of the strict replacement cost of a well-worn 124 year old property may not adequately compensate Cameron for what he lost in the taking." The district court therefore rejected the county's argument that "Cameron should

not receive a 'betterment' over what he had before the taking."

But the district court also correctly reasoned that "Cameron should not enjoy a windfall as a result of the taking." *See State by Lord v. Malecker*, 265 Minn. 1, 6–7, 120 N.W.2d 36, 39 (1963) (indicating the supreme court's objection to a damages-calculation method that would result in a windfall to the owner), *overruled on other grounds by Miller*, 316 N.W.2d at 920–22. The district court explained that:

If Cameron had ever desired to move his business to a new, fully compliant building on his own, he would have done so at significant expense to himself. If Cameron were to get a new building fully at the County's expense simply because his old building was taken, such would seem to put him in a significantly better position than he would have been in had the taking not occurred.

On balance, the district court concluded that Cameron should not have to bear "complete financial responsibility for the incremental 'upgrade' to a more modern building." The district court explained that the county "should not be able to fulfill its obligation to provide just compensation by merely paying the strict replacement cost of a century-old non-compliant building, when reality dictates that it will cost Cameron significantly more than that to obtain a modern building that can house his liquor store business." But the district court rejected Cameron's request for funds to construct a brand new building. We agree with the district court's implicit conclusion that both alternatives would have resulted in a manifest injustice—the former to Cameron and the latter to the public.

The district court's fluid approach to its just-compensation determination is sound. *See Anda*, 789 N.W.2d at 880 ("Courts can be fluid in the standards they apply to

determine 'just compensation' when fairness so requires."). The district court appropriately considered what compensation was just "both to [the] owner whose property [was] taken and to the public that must pay the bill." *Id.* (quotation omitted). And although the district court rejected Cameron's new construction proposal as providing too great a windfall, it awarded him significantly more than the county's appraiser and the commissioners recommended, based on its determination that Cameron would need greater funds to purchase a comparable replacement property in the community. The resulting damages award of $997,055.84 is fair and equitable, and it provides just compensation for the taking. We therefore affirm the award.

## VI.

We last consider Cameron's challenge to the district court's attorney-fee award. Minn.Stat. § 117.031(a) (2010) provides that

> [i]f the final judgment or award for damages, as determined at any level in the eminent domain process, is more than 40 percent greater than the last written offer of compensation made by the condemning authority prior to the filing of the petition, the court shall award the owner reasonable attorney fees, litigation expenses, appraisal fees, other experts fees, and other related costs in addition to other compensation and fees authorized by this chapter.

It is undisputed that the district court's final award exceeded the last written offer of compensation by more than 40%. The county therefore concedes that Cameron is entitled to reasonable attorney fees. Cameron argues that the district court erred in determining the amount of the fee award. Cameron argues that he should have been awarded $217,991.45 in attorney fees. This amount represents the actual fees that he incurred under his attorney-fee agreement, which provided for attorney fees based on one-third of the recovery over the county's original offer or an hourly fee, whichever was greater.

 Generally, appellate courts "review the district court's award of attorney fees or costs for abuse of discretion." *Brickner v. One Land Dev. Co.*, 742 N.W.2d 706, 711 (Minn.App.2007), *review denied* (Minn. Mar. 18, 2008). But Minn. Stat. § 117.031(a) requires the district court to award "reasonable attorney fees," and the reasonable value of counsel's work is a question of fact that we must uphold unless it is clearly erroneous. *See Amerman v. Lakeland Dev. Corp.*, 295 Minn. 536, 537, 203 N.W.2d 400, 400–01 (1973). In determining the reasonableness of attorney fees, the district court should consider: (1) the time and labor required; (2) the nature and difficulty of responsibility assumed; (3) the amount involved and the result obtained; (4) the fee customarily charged for similar legal services; (5) the experience, reputation, and ability of counsel; (6) the fee arrangement existing between counsel and the client. *State by Head v. Paulson*, 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971).

 In determining a reasonable amount of attorney fees, the district court observed that this case required considerable time and labor, and that "it was a difficult case to handle, especially in view of the lack of appellate guidance on the central issue." The district court acknowledged that Cameron's counsel is "highly respected and has considerable experience and ability in the field of eminent domain." In addition, the district court stated that the fees and the fee arrangement were not out of line with what is customarily charged for similar work. The only "problem" that the district court had with Cameron's fee request related to "the amount involved and the results obtained." The

district court observed that Cameron sought $279,998.08 in fees, which was incurred to recover an additional $485,893.49 in compensation. The court stated:

In other contexts, the net result of recovering $205,895.41 more than was spent in fees and costs might be considered an excellent result. Here, however, the Court did not go along with the bulk of Cameron's arguments, and he did not recover nearly the amount that he was seeking. Cameron sought $1,614,600 (plus interest) more than the County offered; the Court awarded him $485,893.49 (including interest). The amount that Cameron did recover came chiefly as the result of the Court's own legal and equitable analysis of what constitutes minimum and just compensation in this case, as opposed to the unsuccessful arguments that Cameron's counsel made regarding new construction, etc. In view of the results obtained, the Court feels that a modest reduction in the requested fees is appropriate.

The district court therefore awarded Cameron one-third of the additional $485,893.49 that he recovered.[4]

In arguing that the district court abused its discretion, Cameron focuses on the fee arrangement, asserting that, "[i]f the claim for reimbursement and/or the affidavits presented in court by attorneys or others demonstrate that the fees considered are reasonable in light of what is regularly charged in the community, the fee [ ] should be held to be *prima facie* 'reasonable' under the statute." We disagree with Cameron's suggestion that so long as the underlying fee arrangement is reasonable, any fees incurred under the arrangement are reasonably awarded under section 117.031(a). A fee arrangement

is only one of six factors to be considered by the district court when determining a reasonable award of attorney fees. *Paulson*, 290 Minn. at 373, 188 N.W.2d at 426. Adoption of Cameron's approach, wherein the fee arrangement alone determines the reasonable fee award, would constitute a departure from precedent. We cannot change the law in this manner. *See Lake George Park, L.L.C. v. IBM Mid-America Emps. Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn.App.1998) (stating that "[t]his court, as an error correcting court, is without authority to change the law"), *review denied* (Minn. June 17, 1998). And because the district court appropriately considered all of the relevant factors and did not clearly err in determining the reasonable value of counsel's work, we affirm its attorney-fee award.

## DECISION

The district court's determination that the South Robert Trail property was a "comparable property" within the "community" is consistent with the common-usage definitions of these terms under the minimum-compensation statute. And the district court appropriately used a market-value analysis based on recent sales data regarding the South Robert Trail property to calculate damages under the minimum-compensation statute. Because the resulting calculation provided just compensation for the taking of Cameron's property, and because the district court did not err in determining a reasonable attorney-fee award, we affirm.

**Affirmed.**

---

4. The brief of Amicus Curiae Minnesota Eminent Domain Institute states that "[p]erhaps the most common method of setting fees between attorneys and clients in Minnesota con-

demnation cases is a contingent fee based on the recovery over the offer made by the condemning authority."