The COUNTY OF DAKOTA,
Respondent,

v.

George W. CAMERON, IV, Appellant.

No. A11–1273.

Supreme Court of Minnesota.

Nov. 27, 2013.

Rehearing Denied Jan. 13, 2014.

James C. Backstrom, Dakota County Attorney, Jay R. Stassen, Michael R. Ring, Assistant County Attorneys, Hastings, MN, for respondent.

Daniel J. Biersdorf, Edward Kelly Keady, Biersdorf & Associates, P.A., Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, Jeffrey S. Thompson, Assistant Attorney General, Saint Paul, MN, for amicus curiae Minnesota Commissioner of Transportation.

Steven J. Quam, Richard D. Snyder, John E. Drawz, Patrick D.J. Mahlberg, Fredrikson & Byron, P.A., Minneapolis, MN, for amicus curiae CapX2020.

Katelynn K. McBride, Anthony B. Sanders, Lee U. McGrath, Minneapolis, MN, for amicus curiae Institute for Justice.

Susan L. Naughton, Saint Paul, MN, for amicus curiae League of Minnesota Cities.

Kirk A. Schnitker, Jon W. Morphew, Schnitker Law Office, P.A., Spring Lake Park, MN; Leland J. Frankman, Harry A. Frankman, Frankman Law Offices, Minneapolis, MN; and Bradley J. Gunn, Malkerson, Gunn & Martin, LLP, for amicus curiae Minnesota Eminent Domain Institute.

OPINION

STRAS, Justice.

The legal questions presented by this case relate to the operation of Minnesota's minimum-compensation statute, Minn.Stat. § 117.187 (2012), which provides a mechanism for compensating property owners who "must relocate" following the condemnation of their real property. Appellant George W. Cameron, IV, who had his commercial property taken by respondent County of Dakota ("the County"), argues that the district court erred when it failed to award him sufficient damages under the minimum-compensation statute to purchase a "comparable property in the community." Minn.Stat. § 117.187. Cameron also challenges the court's award of attorney fees under Minn.Stat. § 117.031(a) (2012). We affirm.

I.

On July 25, 2008, as part of a highway-reconstruction project, the County acquired a commercial property in Inver Grove Heights ("the condemned property") through the exercise of its eminent-domain power. The condemned property, which Cameron owned, included a building constructed in 1885. The building had a 4,444–square–foot ground level and a

1,600—to 2,000–square–foot basement, for a total size of between 6,000 and 6,400 square feet. Cameron operated a high-volume, low-margin liquor business on the condemned property. The taking by the County required Cameron to move his liquor business to a temporary location, and the move made his business less profitable. Cameron rejected the County's initial offer of $560,300 for the condemned property, an offer that was based on the County's calculation of the appraised value of the property using a sales-comparison approach. Following an administrative hearing, three court-appointed condemnation commissioners awarded Cameron $655,000 in damages. Cameron appealed the award to the Dakota County District Court.

An evidentiary hearing followed. At the hearing, Cameron relied on Minnesota's minimum-compensation statute, Minn.Stat. § 117.187, to argue that he was entitled to an award of damages that would allow him "to purchase a comparable property in the community," even if the amount awarded under the minimum-compensation statute exceeded the appraised value of the condemned property. Cameron's expert, Robert Strachota, testified that the relevant "community" in which to locate a comparable property consisted of the "trade area" of Cameron's business, which Cameron testified is an area within three miles of the condemned property. Strachota stated that no comparable property was available for purchase at the time of the taking, either in the trade area of Cameron's business or elsewhere in Inver Grove Heights. Cameron claimed that, in the absence of a comparable property available for purchase, he was entitled to compensation that would allow him to purchase land and construct a new building of comparable size and quality to the building located on the condemned property. Cameron projected that it would cost $2,175,000 to purchase vacant land across

the street from the condemned property and construct a new building.

The County's expert, Daniel Wilson, testified that either the city of Inver Grove Heights or the trade area of Cameron's business could qualify as the relevant "community" under the minimum-compensation statute. Wilson identified a liquor store located on South Robert Trail in Inver Grove Heights ("the Robert Trail property") as a comparable property. The Robert Trail property had sold for $505,000 in June 2008—just 1 month before the County acquired the condemned property. Wilson concluded that, because the condemned property had a higher appraised value than the Robert Trail property, Cameron was not entitled to damages that exceeded the appraised value of the condemned property.

The district court found that the Robert Trail property was both comparable to and located in the same community as the condemned property. Even though the Robert Trail property was no longer available for purchase and the building on the Robert Trail property was much smaller than the building on the condemned property, the court concluded that the two properties were comparable because they "ha[d] similar effective age, condition, quality, and parking/landscaping."

To account for the difference in size between the two buildings, the district court made its own supplementary calculations. First, the court determined that the price-per-square-foot of the main floor of the Robert Trail building was $224.36. Second, the court multiplied the square footage of the main floor of the building on the condemned property (4,444 square feet) by the price-per-square-foot of the main floor of the Robert Trail building ($224.36) to ascertain the amount of damages to which Cameron was entitled under

the minimum-compensation statute.[1] That figure, the court concluded, was $997,055.84.

The district court also awarded attorney fees to Cameron under Minn.Stat. § 117.031(a). That statute provides that a property owner shall recover "reasonable attorney fees" if the final judgment or damages award in an eminent-domain proceeding is, as here, "more than 40 percent greater than the last written offer of compensation made by the condemning authority prior to the filing of the petition." Minn.Stat. § 117.031(a). Cameron sought $217,991.45 in attorney fees based on his fee arrangement with counsel, but the court reduced the award to $161,964.50— an amount equal to one-third of the difference between the court's award of damages for the taking and the last offer made by the County. The court reasoned that Cameron was not entitled to recover the total amount of his requested attorney fees because the court did not accept the "bulk of" Cameron's arguments during the proceeding.

The court of appeals affirmed. *Cnty. of Dakota v. Cameron,* 812 N.W.2d 851 (Minn.App.2012). The court of appeals concluded that the district court did not err when it determined that the Robert Trail property qualified as a comparable property in the community under the minimum-compensation statute. *Id.* at 859–60. The court of appeals further concluded that the district court's award of attorney fees to Cameron was reasonable. *Id.* at 866. We granted Cameron's petition for further review.

## II.

The first issue presented by this case is whether the Robert Trail property qualifies as a "comparable property in the community" under Minnesota's minimum-compensation statute, Minn.Stat. § 117.187. The minimum-compensation statute provides as follows:

> When an owner must relocate, the amount of damages payable, at a minimum, must be sufficient for an owner to purchase a comparable property in the community and not less than the condemning authority's payment or deposit [equal to the condemning authority's approved appraisal of value, as provided] under section 117.042, to the extent that the damages will not be duplicated in the compensation otherwise awarded to the owner of the property.

Minn.Stat. § 117.187.

When we interpret a statute, "we give words and phrases their plain and ordinary meaning." *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 759 (Minn.2010) (citing Minn.Stat. § 645.08 (2012)). If a statute has more than one reasonable interpretation, then the statute is ambiguous and we may resort to the canons of statutory construction to determine its meaning. *See Lietz v. N. States Power Co.,* 718 N.W.2d 865, 870–71 (Minn. 2006). On the other hand, if a statute is susceptible to only one reasonable interpretation, "then we must apply the statute's plain meaning." *Larson v. State,* 790 N.W.2d 700, 703 (Minn.2010).

---

1. It is undisputed that Cameron used the basement of the building on the condemned property as part of his liquor business. Nonetheless, the district court made its calculations based only on the square footage of the main floors of the two buildings in order to benefit Cameron "in the interests of equity and justice." As the court recognized, considering the total square footage of the two properties in making its calculations would have resulted in a smaller award of damages to Cameron under the minimum-compensation statute.

### A.

■ The minimum-compensation statute requires a "comparable property" to be located within the same "community" as the condemned property. Minn.Stat. § 117.187. Properties located beyond the condemned property's "community" cannot provide the basis for damages under the minimum-compensation statute.

The parties disagree about the meaning of the term "community" in the minimum-compensation statute. Cameron would define the term narrowly in this case by restricting it to only those properties that are located within the condemned property's 3–mile trade area. In contrast, the County would define the term more broadly by extending it to any properties that are located within the same city or town as the condemned property. Because the minimum-compensation statute does not define the term "community," we give the term its plain and ordinary meaning. *See State v. Leathers,* 799 N.W.2d 606, 609 (Minn.2011).

The plain and ordinary meaning of the term "community" can refer either to a group of people or to a locality. Specifically, *The American Heritage Dictionary of the English Language* defines "community" in relevant part as either a "group of people living in the same locality and under the same government" or the "district or locality" in which a group of people living in the same locality and under the same government lives. *The American Heritage Dictionary of the English Language* 374 (5th ed.2011). Similarly, *Webster's Third New International Dictionary* defines "community" in relevant part as "the people living in a particular place or region and [usually] linked by common interests; *broadly:* the region itself: any population cluster." *Webster's Third New International Dictionary* 460 (3d ed.2002).

■ In the context of the minimum-compensation statute, which provides compensation for takings of real property, the term "community" refers to a locality, not a group of people. A definition of the term "community" that is demarcated by geographic boundaries most closely reflects the importance of *location* to the value of real estate, which the minimum-compensation statute seeks to measure, and the fixed, immovable nature of most types of real property. *See, e.g., State by Humphrey v. Strom,* 493 N.W.2d 554, 561 (Minn.1992) (stating, in the eminent-domain context, that "[t]he value of any commercial property is dependent in part on its location").

The question, then, is how to identify a locality that constitutes a "community" under the minimum-compensation statute. We begin by noting that a "locality" is not always a city or town. Rather, a "locality" is "[a] particular neighborhood, place, or district." *The American Heritage Dictionary of the English Language* 1029 (5th ed.2011); *see also Webster's Third New International Dictionary* 1327 (3d ed.2002) (defining "locality" in relevant part as "a particular spot, situation, or location: as ... b: a place having or considered in respect to a particular feature <*localities* of heavy rainfall> c: a political subdivision of a state").

■ These definitions of the terms "community" and "locality" share two important features. First, they refer to a particular place that has a socially or governmentally recognized identity. Second, governmental boundaries are relevant to identifying a community or locality, but governmental boundaries do not necessarily define a community or locality. Accordingly, we hold that the term "community" in the minimum-compensation statute means an identifiable locality that has a socially or governmentally recognized

identity, or a group of such localities. Depending on the facts of a particular case, the relevant "community" could be a neighborhood, district, town, village, city, county, region, or other similar locality. Our definition of the term "community," like the minimum-compensation statute itself, applies equally to all types of real property. Nothing in the plain and ordinary meaning of the term "community" or in the remainder of the minimum-compensation statute suggests that we should define the term differently depending on the type of real property at issue.

Further, the plain and ordinary meaning of the term "community" is consistent with the statutory definitions of the term in other Minnesota statutes. For instance, in a statute governing a grant program for older-adult services, "community" is defined as "a town, township, city, or targeted neighborhood within a city, or a consortium of towns, townships, cities, or targeted neighborhoods within cities." Minn.Stat. § 256.9754, subd. 1(a) (2012). Similarly, Minnesota Statutes Chapter 52, which governs credit unions, defines "community" in relevant part as follows:

> "Community" means an identifiable local neighborhood, community, rural district, or other geographically well-defined area in which individuals have common interests or interact. "Well-defined" means the proposed area has specific geographic boundaries, including a school district, city, township, county, or clearly identifiable neighborhood, but does not include the state as a whole.

Minn.Stat. § 52.001, subd. 5 (2012). These provisions, though not controlling, provide general support for the definition of "community" that we adopt today for the minimum-compensation statute.

■ After considering the evidence and testimony at trial, the district court concluded that the city of Inver Grove Heights is the relevant "community" for calculating Cameron's minimum-compensation damages. In doing so, however, the court adopted an unduly narrow definition of the term "community" that is incompatible with the remainder of the minimum-compensation statute. Without citation to a dictionary or other authority, the court concluded that the term "community" in the minimum-compensation statute refers to "a location where a business can survive and be profitable."

While the district court's definition of "community" might be reasonable in the context of the forced relocation of a business, it makes little sense in the context of a forced residential relocation. Indeed, the prospective profitability of a relocated business cannot provide a measure of damages for a taking that has displaced individuals or families from their residence. Thus, the district court's definition of the term "community" either excludes a large number of takings from the umbrella of the minimum-compensation statute or requires the adoption of a second, different definition of the term "community" when a taking results in a residential relocation. *See McLane Minn., Inc. v. Comm'r of Revenue*, 773 N.W.2d 289, 295 (Minn.2009) (rejecting a proposed interpretation because it would result in different meanings for the same word within related statutes). In either case, the court's definition of "community" is unreasonable.

■ The district court nevertheless correctly concluded that the city of Inver Grove Heights is the relevant "community" in this case. Neither party disputes that both of the relevant properties—the condemned property and the Robert Trail property—were located within the city limits of Inver Grove Heights. Because Inver Grove Heights constitutes an identifiable locality that has a socially or governmentally recognized identity, we conclude that

the court did not err when it determined that the Robert Trail property is located in the same "community" as the condemned property.

### B.

■ The minimum-compensation statute also provides that the State must compensate property owners who must relocate after a taking in an amount that is sufficient to purchase a "comparable property." The term "comparable" has acquired a technical meaning in the field of real-estate valuation. *See* Appraisal Institute, *The Appraisal of Real Estate* 137 (13th ed.2008) (explaining that real-estate valuation involves gathering data related to "the property being appraised and to comparable properties"); *see also Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 74 (Minn. 2012) (adopting a technical definition when doing so is consistent with the statutory context). When valuing real estate, the word "comparable" means "[a] piece of property used as a comparison to determine the value of a similar piece of property." *Black's Law Dictionary* 320 (9th ed.2009); *accord* Appraisal Institute, *supra*, at 137; *see also* Minn.Stat. § 273.12 (2012) (directing a tax assessor to "consider and give due weight to lands which are comparable in character, quality, and location, to the end that all lands similarly located and improved will be assessed

upon a uniform basis and without discrimination"). Consistent with its technical meaning, the phrase "comparable property" in the minimum-compensation statute refers to a piece of property that has enough like characteristics and qualities to another piece of property that the value of one can be used to determine the value of the other.[2] *See McNeilus Truck & Mfg., Inc. v. Cnty. of Dodge*, 705 N.W.2d 410, 413–14 (Minn.2005) (discussing the use of comparable properties, including the properties' character, quality, and location, in determining another property's value).

■ The district court concluded that the Robert Trail property is "comparable" to the condemned property. In reaching its conclusion, the court considered such factors as the "effective age, condition, quality, and parking/landscaping" of the properties; the location of the properties within the same city; and the fact that each property was the site of a liquor store. The court's analysis finds support in the testimony of the County's expert, who extensively discussed the similarities between the two properties. Accordingly, we conclude that the court did not err when it found that the Robert Trail property is a "comparable property" under the minimum-compensation statute.[3]

■ Cameron advances two alternative interpretations of the phrase "com-

2. Such characteristics and qualities may include, among others, location, use, physical features, economic attributes, financing terms, conditions of sale, market conditions, and legal characteristics such as zoning and other restrictions. *See* Appraisal Institute, *supra*, at 141.

3. Despite finding that the Robert Trail property is "comparable" to the condemned property, the district court's award of damages did not merely provide an amount "sufficient for [Cameron] to purchase" the Robert Trail property. Rather, the court adjusted the award upward, "in the interests of equity and

justice," to account for the fact that the buildings on the two properties were not the same size. The effect of the court's award was to compensate Cameron in an amount sufficient for him to purchase a *hypothetical* property approximately twice the size of the Robert Trail property. We note that the County has not challenged the $997,055.84 damages award, and we therefore express no opinion about whether the minimum-compensation statute permits an upward or downward adjustment from the value of the comparable property.

parable property," neither of which is reasonable. Cameron first argues that any comparable property under the minimum-compensation statute must be functionally equivalent to the condemned property. For example, in this case, Cameron argues that any comparable property must be able to accommodate his liquor business. While functional equivalence may be relevant to the determination of whether a property qualifies as "comparable," it is not a *necessary* requirement. None of the definitions of the term "comparable" or the phrase "comparable property" requires functional equivalence. Instead, the phrase "comparable property" requires only *enough* like characteristics and qualities to permit the valuation of one property by comparison to another property. Therefore, Cameron's alternative interpretation of the phrase "comparable property" would require us to violate one of our basic canons of statutory interpretation: we do not add words or phrases to an unambiguous statute. *See Premier Bank*, 785 N.W.2d at 760.

■ Cameron's second alternative definition would require a "comparable property" to be available for purchase at the time of the taking. Under Cameron's second definition, if a "comparable property" is not available for purchase at the time of the taking, then the award of minimum-compensation damages must be sufficient for a displaced property owner to purchase land and construct a new building. We disagree.

First, Cameron's alternative interpretation is inconsistent with the technical definition of the phrase "comparable property." In the context of real-estate valuation, a "comparable property" must possess enough like characteristics and qualities to permit the valuation of one property by comparison to another property. We are not aware of any technical definition of the phrase "comparable property" that requires a property also to be contemporaneously available for purchase. Indeed, in the analogous context of tax assessment of real property, we have recognized that a property may still qualify as comparable even if it already has been sold in an "actual market transaction[ ]," *Cont'l Retail, LLC v. Cnty. of Hennepin*, 801 N.W.2d 395, 402 (Minn.2011), and is no longer available for purchase.

■ Second, even if the phrase "comparable property" were ambiguous, we would resolve the ambiguity by applying canons of construction, including the canon of *noscitur a sociis*—a Latin phrase meaning "it is known by its associates." Under the *noscitur a sociis* canon, "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *see also State v. Suess*, 236 Minn. 174, 182, 52 N.W.2d 409, 415 (1952) ("[T]he meaning of doubtful words in a legislative act may be determined by reference to their association with other associated words and phrases."). Application of this canon would undermine Cameron's proposed interpretation of "comparable property."

■ The *noscitur a sociis* canon directs us to interpret the phrase "comparable property" in the minimum-compensation statute in light of the surrounding words and phrases in the statute, including the phrase "damages payable." *See* Minn. Stat. § 117.187 (stating the "amount of damages payable, at a minimum, must be sufficient for an owner to purchase a comparable property in the community"). The phrase "damages payable" refers to money that an entity or a person must pay to another entity or person as compensation for an injury or wrong. *See The Ameri-*

can *Heritage Dictionary of the English Language* 457 (5th ed.2011) (defining "damages" as the "[m]oney required to be paid as compensation for an injury or wrong"); *id.* at 1295 (defining "payable" as "[r]equiring payment to a particular person or entity"); *see also* 4A Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil,* CIVJIG 90.10 (5th ed. 2006) ("The term 'damages' means a sum of money that will fairly and adequately compensate a person who has been [injured or harmed]."). The use of the phrase "damages payable" reveals that the objective of the minimum-compensation statute is to adequately compensate displaced property owners, not to guarantee them the opportunity to purchase a comparable property.

■ To be sure, the word "purchase" appears before the phrase "a comparable property" in the minimum-compensation statute. Minn.Stat. § 117.187. However, the remedy afforded by the minimum-compensation statute is not a replacement property. Rather, the minimum-compensation statute provides for *monetary* compensation, the amount of which is equivalent to the sum necessary to purchase a comparable property. Cameron's alternative interpretation—which would require a "comparable property" to be available for purchase at the time of the taking—would effectively convert the minimum-compensation statute from a compensatory regime into one granting a warranty to displaced property owners guaranteeing a particular result. Such an interpretation is inconsistent with the plain language of the minimum-compensation statute and other pro-

visions in Chapter 117. *See, e.g.,* Minn. Stat. § 117.186, subd. 2 (2012) (requiring a condemning authority to provide loss-of-going-concern damages for a business when *no* comparable property exists); Minn.Stat. § 117.188 (2012) (prohibiting a condemning authority from "requir[ing] the owner to accept as part of the compensation due any substitute or replacement property").[4]

■ Because Cameron has not advanced a reasonable alternative interpretation of the word "comparable," we conclude that the phrase "comparable property" in the minimum-compensation statute refers to an existing property—regardless of its availability for purchase—that has enough like characteristics or qualities to another property that the value of one can be used to determine the value of the other. We further conclude that the district court did not err when it determined that the Robert Trail property qualifies as a "comparable property in the community" of the condemned property.

## III.

■ The second question presented by this case is how to determine whether an award of attorney fees under Minn.Stat. § 117.031(a) is reasonable. Section 117.031(a) states that a court must award a property owner "reasonable attorney fees" if the final judgment or award of damages in an eminent-domain proceeding "is more than 40 percent greater than the last written offer of compensation made by the

4. It also bears noting that Cameron's second alternative definition of the term "comparable" would not afford him the relief that he seeks. The record reveals that Cameron's proposed comparable property—the community park located across the street from the condemned property—was not available for use as a liquor store at the time of the taking. Nor has Cameron shown that the community park was even available for purchase at the time of the taking. Thus, even under Cameron's alternative definition, the community park would not qualify as a "comparable property."

condemning authority prior to the filing of the petition."

■■■ The County does not challenge the district court's award of attorney fees. However, Cameron argues that the award was unreasonably low. More specifically, Cameron argues that the district court erred when it reduced his award to $161,964.50 from the $217,991.45 in attorney fees that he had requested based on his fee arrangement with counsel. We "review an award of attorney fees for an abuse of discretion." *Milner v. Farmers Ins. Exch.*, 748 N.W.2d 608, 620 (Minn. 2008). We will not set aside a district court's factual findings underlying an award of attorney fees "unless they are clearly erroneous." *Bucko v. First Minn. Sav. Bank, F.B.S.*, 471 N.W.2d 95, 99 (Minn.1991).

■■■ The threshold inquiry presented in this case is whether we should adopt the federal lodestar method as the standard for awarding attorney fees under Minn.Stat. § 117.031(a). The lodestar method first requires a district court to "determine the number of hours 'reasonably expended' on the litigation" and multiply that number " 'by a reasonable hourly rate.' " *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 628 (Minn. 1988) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). A court must consider "all relevant circumstances" when evaluating the reasonableness of the hours expended by attorneys and their hourly rates. *State v. Paulson*, 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971); *see also Milner*, 748 N.W.2d at 621 (quoting *Paulson*, 290 Minn. at 373, 188 N.W.2d at 426). A court then evaluates the overall reasonableness of the award by considering such factors as "the time and labor required; the nature and difficulty of the responsibility assumed; the amount involved and the re-

sults obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel and the client." *Paulson*, 290 Minn. at 373, 188 N.W.2d at 426; *see also Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 ("The product of reasonable hours [multiplied by] a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward....").

We have applied the lodestar approach to a variety of Minnesota statutes that provide for attorney fees. *See, e.g., Green v. BMW of N. Am., LLC*, 826 N.W.2d 530, 535–36 (Minn.2013) (lemon law); *Milner*, 748 N.W.2d at 620–24 (Fair Labor Standards Act); *Anderson*, 417 N.W.2d at 628–30 (Human Rights Act); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 542 (Minn.1986) (Securities Act). In fact, we have consistently adopted the lodestar approach whenever a statute contains an explicit directive that an award of attorney fees must be reasonable. *Green*, 826 N.W.2d at 535. While Cameron accurately observes that we have never adopted the lodestar approach under Minn.Stat. § 117.031(a), he does not provide a persuasive justification for adopting a different standard here. Accordingly, we conclude that the lodestar approach governs the determination of the reasonableness of an award of attorney fees under Minn.Stat. § 117.031(a).

■■ In awarding attorney fees to Cameron, the district court discussed the lodestar factors. The court concluded that five of the lodestar factors favored Cameron's requested amount of attorney fees. Specifically, the court stated that the case required "considerable time and labor, and ... was a difficult case to handle," "that Cameron's counsel is highly respected and has considerable experience and ability,"

and that the fee agreement and fees incurred "are not out of line with what is customary for similar work." Nonetheless, the court reduced Cameron's award to $161,964.50—an amount equal to one-third of the difference between the court's damages award and the last amount offered by the County—to account for the fact that the court "did not go along with the bulk of Cameron's arguments, and [Cameron] did not recover nearly the amount that he was seeking." The court therefore relied on the "results obtained" by Cameron's attorneys to justify its conclusion that Cameron was not entitled to recover the full $217,991.45 that he sought in attorney fees.

■ While the district court's explanation for the reduction was somewhat cryptic, we cannot say that the district court abused its discretion in awarding Cameron a lesser amount of attorney fees than he requested. "There is no precise rule or formula" for applying the results-obtained factor, and a district court may either "attempt to identify specific hours that should be eliminated" or "simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933; *accord Milner,* 748 N.W.2d at 624. In this case, the district court opted for the latter approach and therefore did not abuse its discretion.

■ Cameron challenges the district court's methodology by asserting that the results-obtained factor is entitled to little or no weight under Minn.Stat. § 117.031(a). For support, Cameron relies on the fact that he is statutorily entitled to an award of attorney fees because the court's award of damages exceeded the County's last offer by more than 40 percent. The flaw in Cameron's argument, however, is that the 40–percent requirement constitutes a minimum eligibility threshold for an award of attorney fees.

The requirement does not establish a threshold at which the results obtained become irrelevant to determining whether an award of attorney fees is reasonable. Accordingly, although Cameron was statutorily entitled to an award of attorney fees, the court retained the discretion to evaluate the reasonableness of the award by considering all of the lodestar factors, including the results obtained in the litigation.

### IV.

For the foregoing reasons, we affirm the court of appeals' decision upholding the district court's award of $997,055.84 in damages and $161,964.50 in attorney fees to Cameron.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

ANDERSON, Justice (concurring in part, dissenting in part).

I join in the result reached by the court in this condemnation dispute, but dissent from the specific definition of "community" that we announce today.

Some eminent domain background is appropriate here. In *Kelo v. City of New London,* the United States Supreme Court held that the Public Use Clause of the Fifth Amendment of the United States Constitution permits the government to take private property from one owner and transfer that property to other private parties for the purpose of economic development. 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). The *Kelo* decision prompted many states, including Minnesota, to enact legislation aimed at curbing the use of eminent domain. *See* Ilya Somin, *The Limits of Backlash: Assessing*

*the Political Response to Kelo,* 93 Minn. L.Rev. 2100, 2102 (2009) (noting that "a strong case can be made that *Kelo* has drawn a more extensive legislative reaction than any other single court decision in American history").

Minnesota Statutes § 117.187 (2012)—known as the minimum-compensation statute—was enacted as part of a broader set of eminent domain reforms that followed in the wake of the *Kelo* decision. *See* Act of May 19, 2006, ch. 214, §§ 1–22, 2006 Minn. Laws 195, 195–206 (codified at Minn.Stat. §§ 117.012–.52 (2012)). The goal of the minimum-compensation statute is straightforward: it aims to more fully compensate property owners who must relocate when the government takes their property. But if the Legislature intended to increase compensation to displaced property owners, then I fear that Minn.Stat. § 117.187 fails to provide courts with sufficient guidance to achieve that aim.[1]

I begin my analysis by touching on the basic constitutional principles that govern takings compensation. The United States and Minnesota Constitutions require the government to pay "just compensation" when it takes private property for public use. U.S. Const. amend. V; Minn. Const. art. I, § 13. The purpose of paying "just compensation" is to make the property owner whole, which generally is accomplished by paying the property owner the fair market value of the property. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979). Under the fair market value standard, "just compensation" is measured by "what a willing buyer would pay in cash to a willing seller." *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d

1 (1973) (citation omitted) (internal quotation marks omitted); *accord City of St. Paul v. Rein Recreation, Inc.,* 298 N.W.2d 46, 49 (Minn.1980). *See also* Appraisal Institute, *The Appraisal of Real Estate* 25–37 (13th ed.2008).

But the fair market value standard does not capture all of the losses that a property owner incurs when the government exercises the power of eminent domain. *See 564.54 Acres of Land,* 441 U.S. at 511, 99 S.Ct. 1854. As the Supreme Court has explained, although "the market value standard is a useful and generally sufficient tool for ascertaining the compensation required to make the owner whole, . . . such an award does not necessarily compensate for all values an owner may derive from his property." *Id.* For example, the fair market value standard does not compensate property owners for any subjective losses—such as the sentimental value of a longtime family home—or any gains that the government realizes from the taking of their property. *See* Katrina M. Wyman, *The Measure of Just Compensation,* 41 U.C. Davis L.Rev. 239, 254–55 (2007). Nor does the fair market value standard typically capture out-of-pocket expenses that property owners incur, including "attorney[ ] fees, relocation costs, and the cost of replacing the [taken] property if that cost exceeds its fair market value." *Id.* at 254–55. I suggest that the latter problem is increasingly a serious consequence for property owners in this age of complex—and even contradictory and incoherent—zoning and land use restrictions. Consider, for instance, a property owner who owns property that is currently put to a nonconforming use (perhaps even an unpopular nonconforming use) that has limited fair market val-

---

1. Indeed, as the Minnesota Eminent Domain Institute recognized in its amicus brief to our court, "[d]espite the significant implications of Minnesota Statute § 117.187, there is little record as to legislative intent."

ue. Replacing that property may involve costs for the property owner that far exceed the "fair market value" of the taken property.

The minimum-compensation statute mandates that property owners who "must relocate" are entitled to a measure of compensation that "at a minimum . . . [is] sufficient for an owner to purchase a comparable property in the community." Minn. Stat. § 117.187. But even though the objective of the minimum-compensation statute appears to be clear on its face, the statute provides little to no guidance to courts on how that objective should be achieved.

In fact, the Legislature did not define *any* of the key terms in the minimum-compensation statute. Indeed, as the majority aptly notes, "[t]he minimum-compensation statute requires a 'comparable property' to be located within the same 'community' as the condemned property." *Supra* at 7. But the minimum-compensation statute does not define the word "community" or "comparable property," nor does it define the term "relocate." Perhaps the lack of guidance on the key terms in the minimum-compensation statute would be less troubling if it only applied to a specific class of property—for example, residential property. But the minimum-compensation statute defines "owner" broadly to include "the person or entity that holds fee title to the property." Minn.Stat. § 117.187. In other words, the minimum-compensation statute applies to *all* displaced property owners. *See* Mark D. Savin, *The Biggest House in Town: Extending the Limit of Just Compensation,* SN041 ALI–ABA 213, 225 (2008) (ex-

plaining that the minimum-compensation statute "applies to property 'owners' of all types").

Consider, in this case, the dispute over the term "community." Cameron contends that "community" refers to the trade area in which his displaced business is located. The County, for its part, argues that "community" refers to the city or town in which the condemned property is located. The district court concluded that the statutory reference to "community" means "a location where a business can survive and be profitable," and in this case, that definition translated, ultimately, to the city limits of Inver Grove Heights. The majority's formulation is what it describes as the plain and ordinary meaning of "community" described as "an identifiable locality that has a socially or governmentally recognized identity, or a group of such localities." *Supra* at 9. None of these propositions are facially unreasonable.

But while the majority has made a valiant effort to do what the Legislature did not do in defining "community," and while the majority's definition of community might be serviceable in many contexts, I see several problems, not the least of which is that Cameron's definition is arguably better suited for commercial property given that the *sine qua non* for all commercial enterprises is profitability. If the district court's definition did not adequately capture the "community" that applies to residential property, an equally forceful argument can be made that the majority's definition, focusing on individuals and localities, fails to precisely identify "community" for commercial property purposes.[2] An additional concern is that the majority

2. This discussion highlights the problems associated with rejecting Cameron's argument on the basis that his definition made "little sense in the context of a forced residential relocation." *Supra* at 10. The majority's def-

inition appears to be more closely aligned with residential rather than commercial property and the issue in this case is, of course, the valuation of commercial property.

appears to have traded one definitional problem for another; "socially or governmentally recognized identity" as a phrase is no better defined than "community." Finally, it is not hard to posit circumstances that do not fit the majority's definition—a very small city, with no comparable properties, or the reverse, a large metropolitan area composed of many different "communities" with vigorous disagreement about what "community" means. In the end, I fear that the majority is on an unnecessary and problematic errand, at least at this juncture and thus I dissent from the definitional analysis adopted today.

All of that said, regardless of what terms are used, the majority properly affirms the district court's use of municipal boundaries and it is difficult on this record to conclude that it was error for the district court to determine that "community" included the city of "Inver Grove Heights." Put another way, it is sufficient for the purposes of the dispute before us today to affirm the use of municipal boundaries as a way of defining community in this case and leave for some other day, or better yet, legislative action, to further define what "community" means under the statute.

As noted earlier, problems with definitions under the statute are not limited to "community." The minimum-compensation statute says almost nothing about how to calculate the "damages payable" to the displaced property owner once a "comparable property" is located. Minn.Stat. § 117.187. To be sure, the minimum-compensation statute sets the floor: compensation must at a *minimum* "be sufficient for an owner to purchase a comparable property." But parties, and courts, are

clearly struggling with how to calculate damages in the new universe created by the minimum-compensation statute. Cameron, for example, objects to the *partial* hypothetical property created by the district court to assume additional square footage for his business and thus to award damages to him in excess of the traditional fair market value approach; at the same time, Cameron endorses his expert's claim of damages equal to the cost of construction of a *completely* hypothetical property. It is enough here to say that his arguments approving of one hypothetical approach while urging rejection of the other hypothetical approach are not persuasive.[3] Given that the Legislature has provided no guidance on the issue, I conclude that the district court's approach is reasonable under the circumstances presented.

Finally, the minimum-compensation statute says nothing about what happens when no comparable property is available for a displaced property owner to purchase and here I worry that the majority's emphasis on monetary compensation, while not inappropriate, may not accurately reflect what the Legislature intended.

The Legislature's use of the verbs "relocate" and "purchase," instead of a noun such as "value," suggests that the purpose of the minimum-compensation statute is to do more than simply compensate a displaced owner monetarily. Rather, these word choices suggest that the purpose of the minimum-compensation statute is to permit a displaced owner to actually *purchase* a comparable property and *relocate* to that property. But actual relocation cannot occur if *no* comparable property exists or is available for purchase. Indeed, the terms "relocate" and "purchase"

---

**3.** It is important to note, however, that the decision of the district court to reject completely new construction here is not the same as concluding that new construction is never

appropriate as the measure of damages. Damages in the eminent domain context are fact-dependent.

might, in a different case and with different facts than we face today, lead to very different results (e.g., a demand by the property owner for condemning authority to purchase a specific property currently on the market and to relocate the owner to that property). *See Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999) (providing that no word in a statute "should be deemed superfluous, void, or insignificant"). Here, the district court, faced with unique circumstances, fashioned a remedy that I conclude, on this record, was not erroneous. For the reasons discussed earlier, I would affirm the district court but I dissent from the court's adoption of a specific definition of "community."

GILDEA, Chief Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Anderson.