STATE OF MINNESOTA

IN SUPREME COURT

A11-1521

Court of Appeals

Stras, J.
Dissenting, Dietzen, J.,
Gildea, C.J., and Wright, J.

Amos Graves,

       Respondent,

vs.

Filed: February 25, 2015
Office of Appellate Courts

Michael Wayman et al.,

       Respondents,

First Minnesota Bank,

       Appellant.

_____

Jeramie Steinert, Steinert, P.A., Minneapolis, Minnesota, for respondent Amos Graves.

Thomas G. Wallrich, Peter L. Crema, Jr., Cozen O'Connor, Minneapolis, Minnesota, for appellant First Minnesota Bank.

_____

S Y L L A B U S

1.     When a homeowner timely cancels a foreclosure reconveyance under Minn. Stat. § 325N.13 (2014), any deed executed by the homeowner before the cancellation is rendered void.

2.     Because a deed that has been rendered void by a timely cancellation notice under Minn. Stat. § 325N.13 does not transfer title, a mortgagee does not take any

1

interest based on such a deed, even if the mortgagee can establish that it was a bona fide purchaser.

3.       It remains an open question, for consideration by the district court on remand, whether the appellant, the purported mortgagee, has an interest in the property based on equitable principles.

Affirmed in part, reversed in part, and remanded.

O P I N I O N

STRAS, Justice.

This case arises out of the distressed real estate market of the past decade. When respondent Amos Graves was on the verge of losing his home to foreclosure, Michael Wayman persuaded Graves to enter into a transaction that would purportedly save his home. The transaction required Graves to execute a quitclaim deed in favor of a corporate entity under Wayman's control. The day after Graves executed the deed, he sent a timely cancellation notice, as was his statutory right, to Wayman, who refused to cancel the transaction. The eventual mortgagee of the property, appellant First Minnesota Bank, sought ownership of the home in foreclosure when Wayman ceased making mortgage payments. The district court awarded the property to First Minnesota based on the bank's status as a bona fide purchaser, but the court of appeals reversed and awarded the property to Graves free of any interest of the bank. For the reasons that follow, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

## I.

Amos Graves and his late wife bought a home in Saint Paul in 1999. Graves fell behind on his mortgage payments in early 2007, and his mortgage lender, Wells Fargo Bank, foreclosed on the home. Wells Fargo purchased the home at a sheriff's sale on March 13, 2007, which meant that Graves had 6 months, or until September 13, 2007, to redeem the home. *See* Minn. Stat. § 580.23, subd. 1(a) (2014) (providing a mortgagor with 6 months to redeem a property following a foreclosure sale).

During the redemption period, Michael Wayman contacted Graves and offered to help Graves save his home. On August 15, 2007, Wayman met with Graves, who executed a quitclaim deed purporting to transfer the home to REA Group, a company controlled by Wayman. In return, Wayman signed a purchase agreement on behalf of C&M Real Estate Services Group, another of Wayman's companies, which agreed to pay $182,000 to Graves. Graves and Wayman also executed a "residential lease" and a "rent-back agreement" that obligated Graves to pay $1,302 per month to C&M. The rent-back agreement stated that Graves could "purchase the home back for the amount of $170,000" within 6 months. Wayman provided Graves with a form containing the following caption: "Cancellation of Contract Notice." The cancellation form notified Graves that he could cancel the transaction, "without any penalty or obligation, within three business days."

After the meeting with Wayman, Graves changed his mind about the transaction. He signed and dated the cancellation form later that same night, and mailed it to Wayman the next day. Wayman responded by telling Graves that he would not honor the

3

cancellation because, according to Wayman—and contrary to the undisputed facts—Graves did not timely execute the cancellation form.

On September 5, 2007, Wayman recorded the quitclaim deed that Graves had given him at the August 15 meeting. On September 11, 2007—just 2 days before the expiration of the redemption period for the March 2007 sheriff's sale—Wayman took steps to redeem the property through C&M. Specifically, Wayman had REA (which purportedly held title under the quitclaim deed) grant and record a $100 mortgage to C&M. C&M then filed and recorded a notice of intent to redeem Graves's home as a junior creditor.

To carry out the redemption, C&M borrowed $145,000 from First Minnesota Bank and purportedly granted a mortgage to First Minnesota on Graves's home to secure the loan. Wayman faxed the quitclaim deed and the purchase agreement to First Minnesota on September 13, 2007, and the loan closed 4 days later. Of the loan proceeds, roughly $110,000 went to the Ramsey County Sheriff to redeem the property. Approximately $30,500 was supposed to go to Graves, but he never received that money. Graves also never received any part of the $182,000 that Wayman and C&M owed him under the purchase agreement. Nevertheless, Graves continued to live in the home and, for whatever reason, pay $1,302 per month to C&M through mid-2009.

At some point in 2008, Wayman and C&M defaulted on the loan from First Minnesota. In October 2008, First Minnesota sued Wayman, C&M, and REA in Ramsey County District Court to foreclose its mortgage. Graves was not a party to that action. In May 2009, the district court granted summary judgment to First Minnesota and entered

4

an order of foreclosure. Based on that order, the sheriff conducted a second foreclosure sale in August 2009, and First Minnesota bought Graves's home for $145,000. The district court subsequently entered an order confirming the sale, and the redemption period for that sale expired in February 2010.

Graves brought this action against Wayman, his companies, and First Minnesota in June 2009, shortly after First Minnesota prevailed in the foreclosure action. Graves's amended complaint included 13 separately labeled counts alleging common-law claims as well as violations of Minnesota's Home Ownership and Equity Protection Act ("MHOEPA"),[1] *see* Minn. Stat. §§ 325N.10-.18 (2014); federal lending laws; and various consumer-protection statutes. Graves's kitchen-sink complaint boiled down to two principal theories.

First, Graves argued that he did not lawfully sell his home to Wayman in August 2007, and that First Minnesota's mortgage was therefore invalid. To support his argument, he contended that the August 2007 transaction with Wayman was "in fact an equitable mortgage." He also asked that the transaction be declared "void" under Minn. Stat. § 334.05 (2014), which governs usurious contracts, and MHOEPA. And he

---

[1] Throughout the litigation, the parties have referred to the law as Minnesota's Home Ownership and Equity Protection Act, or "MHOEPA," likely because of the formal name of a similar federal law, the Home Ownership and Equity Protection Act of 1994, *see* Truth in Lending Act, 15 U.S.C. §§ 1601-67f (2012). Although Minnesota's law does not appear to have a formal name, we will refer to it here as MHOEPA based on the parties' reliance on that acronym and the law's similarity to, and incorporation of, the federal statutory scheme. *See* Minn. Stat. § 325N.17(a)(4) (2014) (requiring a foreclosure purchaser to comply with the requirements for disclosure, loan terms, and conduct in the federal Home Ownership and Equity Protection Act).

5

requested that the transaction, "[i]f voidable," be "rescind[ed]" under the Truth in Lending Act, 15 U.S.C. §§ 1601-67f (2012); under Minn. Stat. § 8.31 (2014) (a provision authorizing the Attorney General to investigate and punish consumer fraud); under Minn. Stat. § 325N.13 (a provision granting a cancellation right to foreclosed homeowners under MHOEPA); or "as equitable relief under the Minnesota Prevention of Consumer Fraud Act and common law fraud."

Second, Graves argued that, even if he did lawfully sell his home to Wayman in August 2007, he retained a "vendor's lien" on the property that was superior to First Minnesota's mortgage. Under that theory, Graves argued that he was owed roughly $71,000 in proceeds from the sale to Wayman and that he should be entitled to foreclose on his lien and then sell the property to satisfy the outstanding debt.

The district court held a 1-day bench trial. Before the trial, the district court ordered Graves to pick a single theory of the case for trial. Under protest, Graves agreed to proceed on the theory that "the transaction in question was a sale, rather than a mortgage." During and after the bench trial, however, Graves shifted his focus to his arguments under MHOEPA—arguments that have no clear connection to the theory that the transaction was a sale that gave rise to a vendor's lien.

At trial, Graves's counsel elicited testimony about the cancellation notice and asserted that the effect of the cancellation should be determined under MHOEPA. In a written closing argument submitted to the district court after the bench trial, Graves argued both that the transaction was void at the outset and that Graves had cancelled the transaction "[w]hether by statutory right or contract right." Specifically, Graves stated:

6

[T]he transaction was far from compliant with §§ 325N.11–.14 and was void. To be sure, transactions that are contrary to public policy or law are illegal, void and null. The deed conveyed nothing and neither could the subsequent mortgages.

Even if the transaction were valid, [Graves] elected to cancel the transaction that evening. The following day, [Graves] also mailed [his] signed Notice of Contract Cancellation to Mr. Wayman at the address indicated on the form. A void transaction cannot be ratified.

Graves framed his vendor's-lien argument as an alternative to his argument that the transaction was void.

The district court issued the first of three orders for judgment in January 2011. In a January 2011 order, the court found that, "whether by contractual or statutory right, [Graves] exercised [his] right of rescission" with respect to the August 15, 2007, transaction. The court also declared "the contracts in this case" to be "void as against public policy." Accordingly, the court held that the August 15, 2007, quitclaim deed did not convey any interest to REA, and that REA therefore "had nothing to convey to C&M" when REA ostensibly granted a mortgage on the property to C&M. The court awarded damages to Graves to be "secured by a 'vendor's lien' on the real property."

With respect to First Minnesota, the district court found that it was not a bona fide purchaser because it had "made no inquiry of [Graves] or [his] possession of the premises." The court therefore held that Graves's "rights in the Property, whether via Minn. Stat. §§ 325N.10–.18, common law fraud and/or a vendor's lien" were superior to First Minnesota's mortgage. The court awarded title to the home to Graves "free of the interest of any Defendant." Yet the district court also—inconsistently—declared Graves's "vendor's lien" to be "superior to that of First Minnesota." It is not clear

7

whether the district court meant to say that First Minnesota had no interest in the property at all, or that First Minnesota had an interest that was subordinate to Graves's interest.

In any event, after a post-judgment motion by First Minnesota, the district court changed its mind and entered a second order for judgment in April 2011. With respect to the August 15, 2007, transaction, the court again said that the contracts in the case were void (though it now said that Graves had exercised a right of "cancellation" rather than, as in the previous order, a right of "rescission"). The court also again held that the August 15, 2007, quitclaim deed did not convey any interest to REA and that REA therefore "had nothing to convey to C&M" when it ostensibly granted a mortgage on the property. The court awarded damages to Graves but did not award him a vendor's lien.

With respect to First Minnesota, however, the district court reversed course and held that First Minnesota *was* a bona fide mortgagee. The court stood by its factual finding that First Minnesota did not make any inquiry of Graves about his possession of the home, but the court then determined, in tension with its first order, that "even if [First Minnesota] had done so [it] would have only been made aware of the limited extent of Graves['s] interest in the property." Accordingly, the court concluded that "[o]n this record, this Court finds nothing that should disqualify First Minnesota from its status as a bona fide mortgagee" and declared that Graves's "interest in the premises"—whatever that might be—was "subject to that of First Minnesota."

The district court entered a third order for judgment in June 2011 after additional post-judgment briefing. It appears that the district court intended its third order, which is two pages, to supplement the second order rather than to replace it. In the third order, the

8

district court concluded that, because First Minnesota had purchased the property at the August 2009 sheriff's sale and the redemption period had expired, First Minnesota owned the house "free and clear of any encumbrances of other parties."

Graves appealed, and the court of appeals reversed. *Graves v. Wayman*, 816 N.W.2d 655 (Minn. App. 2012). The court of appeals ruled in favor of Graves on two separate theories. Under the first theory, the court of appeals concluded that First Minnesota was not a bona fide purchaser. *Id.* at 667. The court of appeals rejected the district court's speculation that, had First Minnesota inquired further into the transaction between Wayman and Graves, it would have learned nothing more than " 'the limited extent' " of Graves's interest in the property. *Id.* at 668 (quoting the district court order). Instead, according to the court of appeals, First Minnesota should have inquired further because the documents in its possession provided implied notice of Graves's competing interest in the property—that is, had First Minnesota made further inquiries, it would have discovered that Graves had cancelled the transaction with Wayman and his companies. *Id.* at 667. The court of appeals also held that First Minnesota had implied notice that Wayman and his companies had violated MHOEPA, and that First Minnesota had failed to prove that it lacked actual knowledge of the MHOEPA violations. *Id.* at 669. Based on First Minnesota's failure to call the loan officer who conducted the transaction to testify at trial or to present any other evidence that it was without actual notice of Graves's competing claim to the property, the court of appeals concluded that First Minnesota did not qualify as a bona fide purchaser. *Id.* at 665-66.

9

Alternatively, the court of appeals held that Graves's cancellation of the transaction with Wayman was "real, not purported," and that, as a result, "C&M had no interest . . . to convey" to First Minnesota. *Id.* at 669. The court of appeals' second theory was independent of its first because, according to the court, Graves's cancellation of the August 15, 2007 transaction resulted in no interest for C&M to convey to First Minnesota, regardless of whether First Minnesota was a bona fide purchaser. *See id.* Based on these two theories, the court of appeals reversed the district court's second and third orders and directed that the first order, which awarded the property to Graves free of any other interests, be reinstated. *Id.* at 671. We granted First Minnesota's petition for review.

## II.

The Legislature enacted MHOEPA in 2004 to regulate foreclosure reconveyances, Act of May 28, 2004, ch. 263, §§ 1-18, 2004 Minn. Laws. 953, 953-67 (codified at Minn. Stat. §§ 325N.01-.18), which are transactions that target homeowners whose homes are in foreclosure. In general, such transactions, sometimes called "foreclosure rescue scams," target homeowners who are in financial distress and have substantial equity in their homes. *See Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 471 (D. Md. 2009). The foreclosure purchaser obtains title from the homeowner, pays off the balance owed on the mortgage, and then agrees to allow the homeowner to remain in the home through a leaseback arrangement or a contract for deed. *See Johnson v. Wheeler*, 492 F. Supp. 2d 492, 495-96 (D. Md. 2007). When the homeowner fails to make the payments—usually because the terms of the arrangement are unreasonable—the

purchaser is able to evict the homeowner and keep the equity that the homeowner had in the home prior to the transaction. *See Brown v. Grant Holding, LLC*, 394 F. Supp. 2d 1090, 1094-95 (D. Minn. 2005).

These types of equity-stripping transactions qualify as "foreclosure reconveyance[s]" under MHOEPA because they (1) "transfer . . . title to real property by a foreclosed homeowner during a foreclosure proceeding"; and (2) involve a "subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner." Minn. Stat. § 325N.10, subd. 3. The party who enters into such a transaction with the foreclosed homeowner is a "foreclosure purchaser." Minn. Stat. § 325N.10, subd. 4.[2]

No one disputes that the transaction between Wayman and Graves constituted a "foreclosure reconveyance," or that Wayman and his corporate entities were "foreclosure purchaser[s]" under MHOEPA. Nor is there any dispute that Wayman and his entities violated MHOEPA in multiple ways. The outcome of this case, however, does not turn on the MHOEPA violations. Rather, it turns on the legal effect of Graves's timely cancellation of the transaction—that is, whether, after Graves cancelled the transaction, First Minnesota could have obtained rights to the property as a bona fide purchaser without knowledge of the MHOEPA violations. Based on the statutory scheme, we

---

[2]     A "foreclosure purchaser" does not include "a natural person who shows that the natural person is not in the business of foreclosure purchasing and has a prior personal relationship with the foreclosed homeowner" or "a federal or state chartered bank, savings bank, thrift, or credit union." Neither of these exclusions is relevant to this case. Minn. Stat. § 325N.10, subd. 4.

conclude that Graves's timely cancellation left Wayman and his corporate entities with no interest to convey and that, therefore, First Minnesota did not obtain any rights in the property as a bona fide purchaser under MHOEPA.

A.

Graves's cancellation theory resolves this case, so we focus our attention on MHOEPA's text, which is the basis for that theory.[3] Interpretation of a statute presents a question of law that we review de novo. *E.g.*, *In re Estate of Butler*, 803 N.W.2d 393, 397 (Minn. 2011). When a statute is clear and unambiguous, we apply the statute's plain meaning and interpret the words and phrases in the statute according to their plain and ordinary meanings. *Cnty. of Dakota v. Cameron*, 839 N.W.2d 700, 705 (Minn. 2013).

1.

Under MHOEPA, a foreclosed homeowner "has the right to cancel any contract with a foreclosure purchaser" until the earlier of (1) midnight of the fifth business day after signing a contract that complies with MHOEPA, or (2) the end of the foreclosed homeowner's redemption period. Minn. Stat. § 325N.13(a). Cancellation is "effective upon mailing" and "occurs when the foreclosed homeowner delivers, by any means, written notice of cancellation." Minn. Stat. § 325N.13(b). The cancellation right is "[i]n

---

[3]    First Minnesota also challenges the court of appeals' conclusion that it failed to establish bona-fide-purchaser status. *See Graves*, 816 N.W.2d at 667. We need not address that question, however, because we agree with the court of appeals' alternative conclusion that, even if First Minnesota were a bona fide purchaser, it took no interest in the property. *See id.* at 669. Therefore, for the purpose of our analysis, we assume, without deciding, that First Minnesota was a bona fide purchaser.

addition to any other right of rescission" available to the foreclosed homeowner. *Id.* § 325N.13(a). In this case, the district court concluded that Graves exercised his "right of cancellation" when he timely mailed the cancellation notice to Wayman.[4]

The key issue presented by this case is the legal effect of a timely cancellation of a transaction under MHOEPA. Graves argues that, because he timely exercised his right to cancel the transaction, First Minnesota cannot take any interest in the property regardless of whether it qualifies as a bona fide purchaser. According to Graves, the timely cancellation rendered the quitclaim deed void, which left C&M with no interest to convey to First Minnesota. First Minnesota acknowledges that "[t]he general rule, in a standard transaction, is that neither the Recording Act nor the common law bona fide purchaser defense will protect a mortgagee if the mortgagor held no interest in the property." It nevertheless maintains that MHOEPA provides additional rights to a bona fide purchaser in a foreclosure-reconveyance transaction.

MHOEPA provides a right to the foreclosed homeowner to "cancel" the transaction with the foreclosure purchaser, but does not define the word "cancellation" or

---

[4] First Minnesota challenges the district court's finding that Graves cancelled the transaction and suggests that, although Graves testified that he cancelled the transaction, he may have cancelled only the rent-back agreement. First Minnesota further argues that the court of appeals erroneously concluded that it had forfeited its right to challenge the finding that there had been a cancellation. *See Graves*, 816 N.W.2d at 669 (concluding that "[t]he foreclosed homeowners' cancellation of the quitclaim deed and other documents is real, not purported," and that First Minnesota "did not file a notice of related appeal to challenge the district court's conclusion"). Regardless of whether First Minnesota properly raised the issue before the court of appeals, it did not preserve the issue for review by this court because it failed to raise the issue in its petition for review. *See State v. Koppi*, 798 N.W.2d 358, 366-67 (Minn. 2011) (explaining that matters not raised in a petition for review are generally deemed forfeited).

13

explicitly describe the legal effect of a cancellation. The plain and ordinary meaning of "cancel" is "[t]o annul or invalidate." *The American Heritage Dictionary of the English Language* 270 (5th ed. 2011); *see also id.* at 73 (defining the word "annul" to mean, "to . . . declare *void* or invalid" (emphasis added)); *Black's Law Dictionary* 247 (10th ed. 2014) (defining "cancellation" as "[a]n annulment or termination of a promise or an obligation"). The statute as a whole indicates that MHOEPA uses the word "cancellation" in various provisions, including section 325N.13, to refer to the foreclosed homeowner's right to invalidate or rescind the transaction with the foreclosure purchaser. For example, MHOEPA describes cancellation as a remedy "[i]n addition to any *other* right of rescission," Minn. Stat. § 325N.13(a) (emphasis added), which indicates that the act of cancellation itself is a form of rescission under MHOEPA. Indeed, MHOEPA's treatment of cancellation as a form of rescission is consistent with general principles of equity and our case law, which describes " '[t]he equitable remedies of cancellation, rescission, surrender up, and discharge of instruments [as] one and the same remedy, depending upon the same rules.' " *Chilstrom v. Enwall*, 168 Minn. 293, 295, 210 N.W. 42, 43 (1926) (quoting 2 Pomeroy, *Equity Jurisprudence* § 684)).

"Rescission" is "the unmaking or abrogation of a contract." *Abdallah, Inc. v. Martin*, 242 Minn. 416, 420, 423, 65 N.W.2d 641, 644, 646 (1954) ("[T]o rescind a contract is not merely to terminate it but to abrogate it and undo it from the beginning." (citing 1 Black, *Rescission and Cancellation* § 1 (2d ed.))). In the real estate context, we have said that "[r]escission annihilates the contract, and, after a binding election to rescind, *each party is returned to his previously existing rights*." *Brown v. Cal. & W.*

14

*Land Co.*, 145 Minn. 432, 436, 177 N.W. 774, 776 (1920) (emphasis added). Thus, "[t]he effect of the remedy of rescission is generally to extinguish a rescinded contract so effectively that in contemplation of law it has never had existence." *Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc.*, 308 N.W.2d 490, 494 (Minn. 1981). Accordingly, Graves's timely cancellation was the statutory equivalent of rescission, which rendered void all of the instruments—including the quitclaim deed that Wayman and his entities obtained from Graves in the foreclosure-reconveyance transaction—and returned each of the parties to their "previously existing rights." *See Brown*, 145 Minn. at 436, 177 N.W. at 776; *see also Cooper v. Finke*, 38 Minn. 2, 7, 35 N.W. 469, 471 (1887) (explaining that a void instrument is an instrument that "never had any legal existence or binding force").

Our interpretation of MHOEPA also is consistent with the common-law delivery requirement. *See Slawik v. Loseth*, 207 Minn. 137, 139, 290 N.W. 228, 229 (1940) ("It is of course elementary that delivery of a deed is essential to a transfer of title."). As we have stated, "delivery of a deed is complete only when the grantor has put it *beyond his power* to revoke or reclaim it," *Babbitt v. Bennett*, 68 Minn. 260, 263, 71 N.W. 22, 22 (1897) (emphasis added), and an undelivered deed cannot transfer legal title, even to a bona fide purchaser, because lack of delivery renders the deed void, *see White & St. Townsite Co. v. J. Neils Lumber Co.,* 100 Minn. 16, 22, 110 N.W. 371, 374 (1907).

In this case, although Graves physically transferred a quitclaim deed to Wayman, delivery did not occur because Graves never put the deed "beyond his power to revoke or reclaim it." *See Babbitt*, 68 Minn. at 263, 71 N.W. at 22. Instead, Graves retained the

15

power to revoke or reclaim the deed during the statutory cancellation period under Minn. Stat. § 325N.13(a)-(b), which made delivery impossible during the cancellation period. Nor did Graves have the intent to convey title at the conclusion of the cancellation period, because he had already cancelled the transaction. Accordingly, without delivery of the deed to Wayman, the common law treats the quitclaim deed as void. *See White & St. Townsite Co.*, 100 Minn. at 22, 110 N.W. at 374.

Whether analyzed in terms of delivery or rescission, other provisions of MHOEPA reinforce our conclusion that a homeowner's timely notice of cancellation invalidates—that is, renders void—a deed obtained by the foreclosure purchaser. For example, under section 325N.14(a), a contract between a foreclosure purchaser and a homeowner must contain "a conspicuous statement" informing the homeowner of the right to "cancel this contract for the sale of [his or her] house *without any penalty or obligation*" before the end of the cancellation period. Minn. Stat. § 325N.14(a) (emphasis added); *see also* Minn. Stat. § 325N.14(b) (requiring the same statement in the notice-of-cancellation form provided to the homeowner). Section 325N.14(a) demonstrates the Legislature's intent to return the homeowner to the same position as before the transaction with the foreclosure purchaser, which is identical to how rescission operates. *See Brown*, 145 Minn. 432, 436, 177 N.W. at 776 (stating that rescission returns each party "to his previously existing rights"). Moreover, section 325N.13(d) requires a foreclosure purchaser who receives a cancellation notice to "return *without condition* any original contract and any other documents signed by the foreclosed homeowner," Minn. Stat. § 325N.13(d) (emphasis added), which provides support for the theory that, under MHOEPA, Graves could not

16

have delivered the deed to Wayman or his entities before the cancellation period had expired. In fact, far from "abrogat[ing] the common-law delivery rule," as the dissent claims, MHOEPA is consistent with the common-law delivery rule by requiring a foreclosure purchaser to both notify a homeowner of the right to cancel the transaction "without any penalty or obligation" and to return, "without condition," *all* of the documents (including the deed) signed by a homeowner once cancellation occurs. Minn. Stat. §§ 325N.13(d), .14(a); *see Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877-78 (Minn. 2002) (explaining in a mortgage-foreclosure case that courts must presume that a statute is consistent with the common law, and that, if a statute abrogates the common law, it must do so by express wording or necessary implication). Finally, Minn. Stat. § 325N.17(f)(2) expressly forbids a foreclosure purchaser from taking any steps during the cancellation period to transfer a homeowner's interest in the property, including recording or filing any documents signed by the homeowner. These provisions collectively signal the Legislature's clear intent that a cancelled foreclosure-reconveyance transaction is a legal nullity.

In this case, the cancellation of the foreclosure reconveyance became "effective" and "occur[red]" on August 16, 2007, when Graves mailed the notice of cancellation to Wayman. Minn. Stat. § 325N.13(b). The dissent does not dispute that "Graves satisfied the requirements for cancellation of the foreclosure reconveyance under section 325N.13." But the dissent then proceeds to interpret a different statute than the one the Legislature actually enacted. Specifically, the dissent faults Graves for failing to record his cancellation notice—a requirement that is nowhere to be found in MHOEPA and is

17

contrary to the statute, which says that "cancellation" becomes "effective" and "occurs" when a homeowner mails notice of the cancellation to the foreclosure purchaser. *Id.* Instead of creating a novel recording requirement, we simply follow the plain language of the statute and conclude that Graves's cancellation became "effective" and "occur[red]," even as to third parties, when Graves mailed his written cancellation notice to Wayman.

2.

First Minnesota does not dispute that Wayman and his entities lacked a legal interest in the property following Graves's cancellation, but claims that it nevertheless has rights in the property as a bona fide purchaser. We disagree.

The bona-fide-purchaser doctrine is a venerable common-law rule of real estate law, *see Leqve v. Smith*, 63 Minn. 24, 28, 65 N.W. 121, 123 (1895) (Mitchell, J., concurring), that is codified in Minnesota's Recording Act, Minn. Stat. § 507.34 (2014). The Recording Act "serves to protect bona fide purchasers who purchase a property in good faith and lack notice of others' outstanding rights to the property." *Bruggeman v. Jerry's Enters., Inc.*, 591 N.W.2d 705, 710-11 (Minn. 1999). Here, First Minnesota claims that it is a bona fide purchaser because it paid valuable consideration for the mortgage in reliance on the quitclaim deed recorded by REA and lacked notice of either Graves's competing rights to the property or the MHOEPA violations.

Although the bona-fide-purchaser doctrine provides substantial protections against adverse claims when there is no record notice of a prior inconsistent interest, a bona fide purchaser cannot acquire an interest in property when the grantor's underlying deed is void. *See generally* Caryl A. Yzenbaard, *Residential Real Estate Transactions* § 6:25

18

n.47 (2005) (explaining that a void deed represents "one of the 'hidden risks' of the recording system"). It is well established under Minnesota law that when a grantor has "no power" to convey land due to a void deed, the purchaser does not acquire title, and "it is immaterial whether [the purchaser] was a bona fide purchaser or not." *White & St. Townsite Co.*, 100 Minn. at 22, 110 N.W. at 374; *cf. Bausman v. Faue*, 45 Minn. 412, 417, 48 N.W. 13, 15-16 (1891) ("[W]here a deed was stolen from the [owner], or its possession fraudulently got by the [grantor], . . . a bona fide purchaser [is] in no better condition than his grantor."). Accordingly, under longstanding principles of real estate law, First Minnesota could not gain any rights in the property from C&M, even as a bona fide purchaser, because C&M had nothing to convey to First Minnesota. Nothing plus nothing still equals nothing.[5]

---

[5] The dissent disagrees with our characterization of the cancelled foreclosure reconveyance as "void," claiming that we actually mean that the transaction was "voidable." Consistent with the cancellation provisions of MHOEPA, Minn. Stat. § 325N.13, we interpret "void" to mean "[o]f no legal effect; to null," *Black's Law Dictionary* 1805 (10th ed. 2014), which is consistent with MHOEPA's direction that a homeowner who timely cancels incurs no "penalty or obligation," Minn. Stat. § 325N.14(a). It is clear that, once Graves cancelled the transaction, the Wayman entities had absolutely no legal interest in the property and thus had nothing to convey, contrary to the position adopted by the dissent, which views the foreclosure reconveyance as merely "voidable"—that is, "capable of being affirmed or rejected," *Black's Law Dictionary* 1805. Tellingly, First Minnesota is not claiming an interest in the property under either the Recording Act or the common law. In fact, First Minnesota acknowledges that a bona fide purchaser generally has no protection against a voided transfer. *See, e.g.*, *White & St. Townsite Co.*, 100 Minn. at 22, 110 N.W. at 374. Consequently, the position of the dissent goes beyond the position of First Minnesota and would grant protections to bona fide purchasers under the Recording Act and the common law that even First Minnesota candidly admits that it lacks.

3.

First Minnesota acknowledges the "general rule" that a mortgagee—here, First Minnesota—cannot claim an interest in property as a bona fide purchaser if the mortgagor—here, C&M—"held no interest in the property." However, First Minnesota argues that the general rule does not apply in this case because MHOEPA grants additional rights beyond the common law and the Recording Act that allow a bona fide purchaser to take an interest from a void deed. First Minnesota relies primarily on Minn. Stat. § 325N.17(f)(3), which prohibits a foreclosure purchaser during the cancellation period from "transfer[ring] . . . or purport[ing] to transfer . . . any interest in the residence in foreclosure to any third party," but expressly provides that "no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser . . . for value and without notice of a violation of [MHOEPA]." Because this provision applies even when a foreclosure purchaser "purport[s] to transfer" an interest in property, *id.*, First Minnesota argues that the protections afforded to bona fide purchasers under MHOEPA extend even to purported transfers.

As an initial matter, we observe that section 325N.17(f)(3) has no application here because, by its terms, it does not apply to transfers or purported transfers of property that occur after the cancellation period has expired. *See* Minn. Stat. § 325N.17(f) (proscribing specified acts "until the time during which the foreclosed homeowner may cancel the transaction has fully elapsed"). Consequently, regardless of the scope of rights available to bona fide purchasers under section 325N.17(f)(3), the provision protects bona fide purchasers only with respect to transactions that take place during the cancellation period.

In this case, because C&M did not transfer or purport to transfer an interest in the property to First Minnesota until *after* the cancellation period had expired,[6] section 325N.17(f)(3) does not provide First Minnesota with rights to the property as a bona fide purchaser.

Remarkably, the dissent asserts that Minn. Stat. § 325N.17(f)(3) applies in this case because "REA's grant of a mortgage to C&M during the cancellation period was a violation of Minn. Stat. § 325N.17(f)(3), and the violation triggered the proviso that 'no grant of any interest is defeated or affected as against a bona fide purchaser or encumbrance for value.'" In other words, the dissent takes a nominal transaction between two Wayman entities for $100, conducted solely to further the scheme, and gives it decisive significance in determining the third-party rights of First Minnesota. Even apart from the fact that C&M cannot be a bona fide purchaser because Wayman necessarily had actual knowledge of his own violations, the dissent reads section

---

[6] The length of the cancellation period under MHOEPA expires on the earlier of (1) "midnight of the fifth business day following the day on which the foreclosed homeowner signs a contract that complies" with MHOEPA, or (2) "8:00 a.m. on the last day of the period during which the foreclosed homeowner has a right of redemption." Minn. Stat. § 325N.13(a). The district court concluded that the 5-day cancellation period never began to run because the parties never executed a contract that complied with MHOEPA. *See* Minn. Stat. § 325N.14(d) ("The five business days during which the foreclosed homeowner may cancel the contract must not begin to run until all parties to the contract have executed the contract and the foreclosure purchaser has complied with this section."). But even if the district court was correct and the 5-day period never commenced, the cancellation period expired, at the latest, on September 13, 2007, which was the last day of Graves's redemption period. *See* Minn. Stat. § 325N.13(a). C&M purported to convey a mortgage to First Minnesota on September 17, which was 4 days after the last day of the redemption period. Therefore, the purported transfer from C&M to First Minnesota occurred after the cancellation period had expired.

21

325N.17(f)(3) too broadly. Section 325N.17(f)(3) provides only that a foreclosure purchaser shall not, during the cancellation period, "transfer or encumber or purport to transfer or encumber any interest in the residence in foreclosure *to any third party*" (emphasis added). Setting aside the lack of any interest for C&M or REA to convey to First Minnesota—and the fact that the transaction between REA and C&M occurred after Graves had cancelled—the dissent's analysis is inconsistent with the district court's findings and conclusions. Specifically, the district court concluded that (1) REA and C&M were alter egos of Michael Wayman and that each "could only act through Wayman"; (2) C&M "acted in joint venture with REA"; and (3) REA was "merely a pawn to create a $100.00 mortgage." Accordingly, there was no transfer or purported transfer of an interest in the property to *a third party* during the cancellation period that could have triggered the bona-fide-purchaser provision, even under the dissent's creative interpretation of the transaction that occurred in this case.[7]

We also disagree more broadly with the dissent's interpretation of the statute, which effectively negates the statutory protections afforded to foreclosed homeowners under MHOEPA. The dissent criticizes us for our "inequitable treatment" of First Minnesota, without mentioning that Graves did everything he was required to do under MHOEPA, yet would still lose his home under the dissent's approach. In effect, the

---

[7] Contrary to the dissent's suggestion, the district court did not conclude that C&M was a "third party" for the purpose of Minn. Stat. § 325N.17(f)(3). Rather, the district court concluded that Wayman transacted with Graves on behalf of both REA and C&M and that REA and C&M were each "foreclosure purchaser[s]" under Minn. Stat. § 325N.10, subd. 4, "act[ing] in furtherance of a joint venture."

22

dissent turns a statute protecting homeowners from the predatory practices of foreclosure purchasers into one protecting third-party lenders at the expense of homeowners. The dissent is, however, correct about one thing: section 325N.17(f)(3) *does* protect the rights of a bona fide purchaser that obtained an interest in the property during the cancellation period. But it does so only when a homeowner *does not cancel the transaction*.

The dissent asserts that our interpretation of Minn. Stat. § 325N.17(f)(3) is "far-fetched" because the bona-fide-purchaser provision would apply only in "a scenario . . . too fanciful to be taken seriously." According to the dissent, the bona-fide-purchaser rule would apply under our interpretation only in the unlikely scenario that a foreclosed homeowner has strategically allowed the cancellation period to expire without cancelling the transaction. While the posited scenario is indeed unlikely, as the dissent claims, the dissent ignores the far more common scenario in which a homeowner fails to cancel the transaction, the foreclosure purchaser violates some requirement in MHOEPA, and the foreclosure purchaser has conveyed the property to a bona fide purchaser during the cancellation period. Under those circumstances, when a homeowner has failed to cancel the transaction, a bona fide purchaser takes an interest in the property, regardless of the foreclosure purchaser's violation of "sections 325N.10 to 325N.18," so long as the bona fide purchaser had no notice of the MHOEPA violations. Minn. Stat. § 325N.17(f)(3). It is only when a homeowner timely cancels a transaction that a bona fide purchaser's interest is defeated by a homeowner's superior right to the property.

More fundamentally, the dissent's interpretation of Minn. Stat. § 325N.17(f)(3) disregards other provisions of MHOEPA and would have far-reaching consequences for

unsuspecting homeowners. For instance, the dissent never explains how its interpretation gives any meaning to the statutory warning, which *must* accompany both the contract and the cancellation notice, informing a homeowner that he or she may exercise the cancellation right without "any penalty or obligation." Minn. Stat. § 325N.14(a)-(b).

Furthermore, the dissent's broad reading of MHOEPA's bona-fide-purchaser provision, taken at face value, would apparently allow a bona fide purchaser to take an interest in the property even if the foreclosure purchaser had used a forged or stolen deed to convey an interest, so long as the bona fide purchaser had no knowledge of the forgery or theft. According to the dissent, the *only* two "triggering requirements" for bona-fide-purchaser status under MHOEPA are that the conveyance to the third party must occur during the cancellation period and that the third party must be a "bona fide purchaser . . . for value and without notice of a violation of sections 325N.10 to 325N.18." Yet there is no indication that MHOEPA casts aside the black-letter rule, long recognized by the common law, that to convey an interest in the property, the grantor must actually have an interest to convey. *See, e.g.*, *White & St. Townsite Co.*, 100 Minn. at 22, 110 N.W. at 374; *see also Shaw Acquisition Co.*, 639 N.W.2d at 877-78 (stating the general rule that the Legislature only abrogates the common law by express wording or necessary implication). Just as a bona fide purchaser cannot take an interest from a forged or stolen deed, neither can a bona fide purchaser take an interest when a homeowner has timely cancelled a foreclosure reconveyance.

First Minnesota and the dissent also rely on the bona-fide-purchaser provision in Minn. Stat. § 325N.18, subd. 3, which provides: "[n]o action under this section shall

24

affect the rights in the foreclosed property held by a good faith purchaser for value under sections 507.34, 508.48, 508A.48, or other applicable law." This section, by its terms, only protects First Minnesota's existing rights—that is, "rights . . . held," Minn. Stat. § 325N.18, subd. 3—and does not create additional rights in favor of a third party whose claim of title rests on a void deed. First Minnesota acknowledges that the Recording Act and the common law do not protect a good faith purchaser for value when the underlying transaction is void. Therefore, First Minnesota cannot claim an interest in the property based on Minn. Stat. § 325N.18, subd. 3.

In conclusion, although two provisions of MHOEPA address the bona-fide-purchaser rule, Minn. Stat. § 325N.17(f)(3) and Minn. Stat. § 325N.18, subd. 3, neither creates new rights for a bona fide purchaser nor changes the fact that the quitclaim deed was void because Graves timely exercised his right to cancel the transaction. In short, because the deed underlying First Minnesota's mortgage was void, First Minnesota took no legal interest in the property based on its claimed status as a bona fide purchaser.

B.

After concluding that First Minnesota is not entitled to rights in the property as a bona fide purchaser, the court of appeals awarded title to the property to Graves, free of the interest of any other party, including First Minnesota. *Graves*, 816 N.W.2d at 671. First Minnesota argues that the court of appeals failed to consider the consequences of Graves's failure to redeem the property from the original sheriff's sale.

We agree that just because First Minnesota lacked a valid mortgage does not necessarily mean that the district court should have awarded the property to Graves.

25

After all, 5 months before the August 2007 transaction between Graves and Wayman, Wells Fargo purchased Graves's home at a sheriff's sale, and Graves did not redeem the home during the redemption period. Logically, if C&M was not a proper redemptioner in September 2007 because the quitclaim deed under which it took a mortgage was void, then legal title would have vested in Wells Fargo upon expiration of the redemption period. *See* Minn. Stat. § 580.12 (2014) (providing that once a sheriff's certificate of sale is recorded, "upon expiration of the time for redemption, the certificate shall operate as a conveyance to the purchaser or the purchaser's assignee of all the right, title, and interest of the mortgagor").

First Minnesota argues that granting Graves "free and clear title" is unjust "in light of the fact that it was [First Minnesota's] funds that redeemed the Property from the prior foreclosure." Because the equitable arguments have not been fully developed or considered by the courts below, we reverse the court of appeals' conclusion that Graves should be awarded title to the property free of any interest of First Minnesota. We also remand to the district court for further proceedings to determine whether First Minnesota has an interest in the property based upon equitable principles. *See Knight v. Schwandt*, 67 Minn. 71, 74, 69 N.W. 626, 627 (1896) (stating that a party who had redeemed property from a sheriff's sale based on a void deed "was not a legal redemptioner," but

that "it does not follow that his redemption is nugatory as to the purchaser at the mortgage sale, which accepted and retained his money").[8]

### III.

For the foregoing reasons, we affirm the decision of the court of appeals in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

---

[8] The dissent contends that, because we have refrained from setting out "any basis upon which First Minnesota could be entitled to equitable relief," the prospect of equitable relief must be "illusory." The court of appeals did not discuss the availability of equitable relief, and First Minnesota did not seek review of any issue relating to equitable relief. Accordingly, our decision to refrain from engaging in a full discussion of the equitable relief to which First Minnesota may be entitled simply reflects our respect for the general rule that we do not address issues that are not properly before us on appeal. *See, e.g.*, *State v. Koppi*, 798 N.W.2d 358, 366-67 (Minn. 2011).

27

DISSENT

DIETZEN, Justice (dissenting).

Minnesota law, as expressed in the common law and codified in the Recording Act, has long protected the rights of a bona fide purchaser of real property against an unrecorded right in the same property. Those rights were preserved and extended by the Legislature when it enacted Chapter 325N. Today the majority ignores and disregards those rights. Instead, the majority engages in reasoning best characterized as a fast skate across thin ice to conclude that in a foreclosure repurchase transaction, the rights of a seller of real property trump the rights of a bona fide purchaser. Such a determination is not only contrary to the express provisions of Minn. Stat. §§ 325N.17(f)(3) and 325N.18, subd. 3 (2014), it is also contrary to the common law. Further, the majority's opinion casts doubt on the ability of a buyer to rely on record title for any transaction that occurs during a foreclosure redemption period. Consequently, I dissent.

The issue in this case is whether First Minnesota, which loaned $145,000 against the security of Graves's house, has any right to recover its loan from Graves when it had no notice that Graves had exercised his statutory cancellation right—indeed, when it had no notice that any party had an interest in the property except Michael Wayman and his entities (collectively, "Wayman").[1] The issue is not whether Wayman was a scoundrel

---

[1]    Or so we must assume. Although the court of appeals concluded that First Minnesota was not a bona fide purchaser, *see Graves v. Wayman*, 816 N.W.2d 655, 664-69 (Minn. App. 2012), the majority holds that even a bona fide purchaser in First Minnesota's position has no rights against a homeowner. *Supra* at 12, n.3.

who defrauded Amos Graves and his wife: the district court settled that question when it found that Wayman committed numerous violations of Minn. Stat. §§ 325N.10-.18 (2014), and granted an award of exemplary damages against Wayman, and in favor of Graves, in an amount more than $107,000.[2]

The question is purely one of law—does Graves's cancellation of his conveyance to Wayman under Minn. Stat. § 325N.13 operate as a legal bar to First Minnesota's bona fide purchaser defense under sections 325N.17(f)(3) and 325N.18, subdivision 3? To answer this question, I will first examine and interpret the text of Minn. Stat. §§ 325N.13, 325N.17(f)(3), and 325N.18, subd. 3, in the context of the Recording Act, Minn. Stat. § 507.34 (2014), and then address the arguments raised by the majority.

I.

In 2004 the Legislature enacted Minn. Stat. §§ 325N.10-.18. Act of May 28, 2004, ch. 263, §§ 10-18, 2004 Minn. Laws 953, 959-67. The statute regulates a

---

[2]     Under the majority's approach, Graves receives not only the $107,000 judgment against Wayman, but also the continuing right to possession of the foreclosed property worth $182,000, notwithstanding that Graves has never redeemed the property.

"foreclosure reconveyance"[3] between a "foreclosed homeowner"[4] and a "foreclosure purchaser."[5]  A foreclosure reconveyance must comply with a number of requirements, including that the reconveyance be in the form of a written contract, Minn. Stat. § 325N.11; that the contract contain the entire agreement of the parties and include a notice of cancellation, Minn. Stat. § 325N.12; and that the notice of cancellation state the foreclosed homeowner has the right to cancel the foreclosure reconveyance by mailing the notice to the foreclosed purchaser within the cancellation period, Minn. Stat. §§ 325N.13-.14.

---

[3]    A "foreclosure reconveyance" means a transaction involving:

(1) the transfer of title to real property by a foreclosed homeowner during a foreclosure proceeding . . . that allows the acquirer to obtain title to the property by redeeming the property as a junior lienholder; and
(2) the subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner by the acquirer or a person acting in participation with the acquirer that allows the foreclosed homeowner to possess either the residence in foreclosure or other real property, which interest includes, but is not limited to, an interest in a contract for deed, purchase agreement, option to purchase, or lease.

Minn. Stat. § 325N.10, subd. 3.

[4]    A "foreclosed homeowner" means "an owner of residential real property, including a condominium, that is the primary residence of the owner and whose mortgage on the real property is or was in foreclosure."  Minn. Stat. § 325N.10, subd. 2.

[5]    A "foreclosure purchaser" means "a person that has acted as the acquirer in a foreclosure reconveyance" as well as "a person that has acted in joint venture or joint enterprise with one or more acquirers in a foreclosure reconveyance."  Minn. Stat. § 325N.10, subd. 4.

No one disputes that Graves was a foreclosed homeowner, that Wayman was a foreclosure purchaser, that the transaction between Graves and Wayman was a foreclosure reconveyance, or that Wayman violated multiple provisions of sections 325N.10-.18. Instead, the dispute is about whether First Minnesota is protected as a bona fide purchaser, notwithstanding Graves's cancellation of the foreclosure reconveyance. Thus, we must examine the statute's cancellation provisions and its protections for bona fide purchasers.

Graves exercised the right of cancellation set out in Minn. Stat. § 325N.13, which provides that "[i]n addition to any other right of rescission, the foreclosed homeowner has the right to cancel any contract with a foreclosure purchaser" within a specified cancellation period. Minn. Stat. § 325N.13(a). Section 325N.13 goes on to provide that "[c]ancellation occurs when the foreclosed homeowner delivers, by any means, written notice of cancellation." Minn. Stat. § 325N.13(b). I agree with the majority and the lower courts that Graves satisfied the requirements for cancellation of the foreclosure reconveyance under section 325N.13.

But section 325N.13 is subject to two separate provisions that, notwithstanding a possible violation of that statute or other provisions of Minn. Stat. §§ 325N.10-.18, protect a bona fide purchaser's rights. First, Minn. Stat. § 325N.18, subd. 3, which is part of the enforcement section of the statute, affords a foreclosed homeowner a private right of action except that "[n]o action under this section shall affect the rights in the foreclosed property held by a good faith purchaser for value under sections 507.34, 508.48, 508A.48, or other applicable law." Thus, section 325N.18, subdivision 3,

provides that an action to enforce rights under Minn. Stat. §§ 325N.10-.17 is subject to the limitations of Minn. Stat. § 507.34, which is commonly known as the Recording Act.

The Recording Act has long defined the rights of a bona fide purchaser under Minnesota law. *See, e.g.*, Minn. Gen. Stat. ch. 40, § 21, at 330-31 (1866) (enacting substantively identical predecessor to the Recording Act); *Miller v. Hennen*, 438 N.W.2d 366, 369 (Minn. 1989). It provides that any unrecorded "conveyance of real estate" is "void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate, or any part thereof, whose conveyance is first duly recorded." Minn. Stat. § 507.34. A "purchaser" under the Recording Act includes a mortgagee, and a "conveyance" broadly includes "every instrument in writing whereby any interest in real estate is created, aliened, mortgaged, or assigned or by which the title thereto may be affected in law or in equity." Minn. Stat. § 507.01 (2014). The purpose of the Recording Act is to "protect persons who buy real estate in reliance upon the record." *Miller*, 438 N.W.2d at 369 (citing *Strong v. Lynn*, 38 Minn. 315, 317, 37 N.W. 448, 449 (1888)). As we have observed at least as long ago as 1880, these protections facilitate functioning real estate markets:

> But if titles held under such sales are liable to be defeated by secret frauds, which the vigilance of a purchaser cannot guard against, they can hardly be regarded as salable titles. *No prudent man could pay a fair price for a title liable to such imputation.* Make it a rule that sales perfectly fair on their face, which, so far as appears, have been conducted according to law, and which have been confirmed by the court ordering them, may be at any time and by any body shown to be null, and the titles under them entirely defeated, by proof of a secret understanding between a trustee and a purchaser, and such sales, as a means of obtaining the value of the land sold, will be impracticable.

> The uncertainty which such a rule would introduce into titles would be contrary to the general policy of the law on the subject of titles, to real estate. That policy is to give stability to titles, and to enable purchasers using proper caution to be secure in the titles they take. This is the purpose of the statute regulating the registering of deeds [i.e., the Recording Act].

*White v. Iselin*, 26 Minn. 487, 492-93, 5 N.W. 359, 363 (1880) (emphasis added).

For purposes of the Recording Act, we have defined a "subsequent purchaser in good faith," which we have also referred to as a "bona fide purchaser," as one who acquires property (1) in good faith; (2) for valuable consideration; and (3) without actual, constructive, or implied notice of others' prior adverse claims at the time of conveyance. *Anderson v. Graham Inv. Co.*, 263 N.W.2d 382, 384 (Minn. 1978); *Bergstrom v. Johnson*, 111 Minn. 247, 250, 126 N.W. 899, 900 (1910).

The basic requirements of section 325N.18, subdivision 3, are satisfied in this case. Minnesota Statutes § 325N.18, subd. 3, states that "[n]o action under this section shall affect the rights in the foreclosed property held by a good faith purchaser for value under" the Recording Act. Graves brought his action in relevant part under section 325N.18,[6] so the factual predicate of the statute is satisfied. And for purposes of the Recording Act, it is evident that Graves's cancellation notice meets the description of an "instrument in writing whereby any interest in real estate is created, aliened, mortgaged,

---

[6] In his Amended Complaint, Graves requests the court to "rescind[] the transaction between Plaintiff and Defendants . . . under the Truth in Lending Act, *Minn. Stat. § 325N.13*, Minn. Stat. § 8.31, or as equitable relief under the Minnesota Prevention of Consumer Fraud Act and common law fraud" (emphasis added). *See* Minn. Stat. § 325N.18, subd. 1 (providing remedies for "[a] violation of sections 325N.10 to 325N.17").

or assigned *or by which the title thereto may be affected* in law or in equity," Minn. Stat. § 507.01 (emphasis added)—that is, a conveyance. Because Graves's cancellation notice was a "conveyance" under the Recording Act, and because it undisputedly was not recorded,[7] the Recording Act provides that it is "void as against any subsequent purchaser in good faith and for a valuable consideration of the same real estate," Minn. Stat. § 507.34—in this case, First Minnesota.

Second, Minn. Stat. § 325N.17(f)(3) provides specific protections for bona fide purchasers in certain situations. Section 325N.17(f)(3), a part of the prohibited practices section of the statute, forbids the foreclosure purchaser from engaging in various practices, including:

> (f) do[ing] any of the following until the time during which the foreclosed homeowner may cancel the transaction has fully elapsed:
> . . . .
>> (3) transfer or encumber or purport to transfer or encumber any interest in the residence in foreclosure to any third party, *provided no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser or encumbrance for value and without notice of a violation of sections 325N.10 to 325N.18*, and knowledge on the part of any such person or entity that the property was "residential real property in foreclosure" does not constitute notice of a violation of sections 325N.10 to 325N.18. This section does not abrogate any duty of inquiry which exists as to rights or interests of persons in possession of the residential real property in foreclosure
>> . . . .

---

[7]     The majority suggests that by applying the Recording Act I would create a "novel recording requirement." *Supra* at 18. As I have described in the main text, there is nothing novel about the Recording Act's requirements, or the right of a bona fide purchaser to rely upon record title.

(emphasis added). That is, section 325N.17(f)(3) comes into effect when a foreclosure purchaser "transfer[s] or encumber[s] or purport[s] to transfer or encumber any interest in the residence in foreclosure to any third party," and provides that no such "grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser" who lacks notice of a violation of sections 325N.10-.18. *Id.*

Like the general preservation of bona-fide-purchaser rights under Minn. Stat. § 325N.18, subd. 3, the specific proviso in Minn. Stat. § 325N.17(f)(3) clearly applies to preserve the bona-fide-purchaser rights of a party such as First Minnesota in this case. The target of section 325N.17(f)(3) is the transfer or encumbrance of the foreclosed property that occurs during the cancellation period. Such a transaction is prohibited, subject to the rights of a bona fide purchaser. It is undisputed that a Wayman entity, REA, granted a mortgage to C&M (and that mortgage was recorded) during the cancellation period.[8] REA's grant of a mortgage to C&M during the cancellation period was a violation of Minn. Stat. § 325N.17(f)(3), and the violation triggered the proviso that "no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser or encumbrance for value." *Id.*

First Minnesota has established that a Wayman entity encumbered the foreclosed property during the cancellation period in violation of Minn. Stat. § 325N.17(f)(3). The

---

[8] Because Wayman had never provided a contract that complied with sections 325N.10 to 325N.15, the cancellation period extended until September 13, 2007, which was the last day that Graves had a right to redeem under the foreclosure of the Wells Fargo loan. *See* Minn. Stat. § 325N.13(a).

relevant question is whether First Minnesota was a bona fide purchaser within the meaning of the statute.

## II.

The majority contends that the bona fide purchaser provisions of section 325N.17(f)(3) are not applicable because First Minnesota did not take title during the cancellation period. The majority misreads the statute. The protections of section 325N.17(f)(3) apply only when two separate and distinct factors are present. First, a prohibited transaction must occur during the cancellation period. Minn. Stat. § 325N.17(f). As discussed above, REA granted a mortgage to C&M during the cancellation period in violation of the statute.[9] Second, the purchaser seeking protection must be "a bona fide purchaser . . . for value and without notice of a violation of sections 325N.10 to 325N.18." Minn. Stat. § 325N.17(f)(3). If both factors are present, then the purchaser is entitled to the protections of the statute, which specifies that "no grant of any

---

[9] The majority asserts, based on the district court's finding that REA and C&M were alter egos of each other and of Wayman, that the grant of the mortgage was not a grant of an interest to a "third party" as proscribed by section 325N.17(f)(3). *Supra* at 21-22. This is flatly contradicted by the district court's conclusion, unchallenged by any party in this appeal, that one of many acts by Wayman that "violate Minn. Stat. § 325N.17(f)" was that "REA executed a mortgage to C&M during the rescission period and recorded the same."

The damage caused by the majority's position goes far beyond its disregard of the proceedings in this case. In striving to reach its desired outcome, the majority asserts that a violation of the plain language of Minn. Stat. § 325N.17(f)(3) is *not an actual violation* if it is "nominal" and "conducted solely to further the scheme." Not only was the grant of the mortgage to C&M in this case "conducted solely to further the scheme," it was *vital* to the perpetuation of the scheme. Yet the majority ignores the language of the statute to hold that it was not a violation.

interest or encumbrance is defeated or affected" against such a purchaser. *Id*. At this stage of the proceeding, we must assume that First Minnesota is a bona fide purchaser without notice. Because both triggering requirements are present in this case, the requirements of section 325N.17(f)(3) are satisfied.

Not only does this interpretation of section 325N.17(f)(3) give effect to the plain meaning of the statute, it also makes sense from a policy standpoint. It would make little sense to provide protections for a bona fide purchaser who took the property during the cancellation period, and then have those protections not extend to a subsequent transferee.

But the majority's interpretation suffers from an even more serious defect. The majority interprets the proviso in section 325N.17(f)(3) to apply only when a foreclosure purchaser engages in a prohibited practice *and* the foreclosed homeowner does not cancel the transaction during the cancellation period. Then and only then, on the majority's account, is the bona-fide-purchaser proviso triggered. The majority's interpretation is unreasonably narrow: the most natural reading of the text is that the proviso applies whether the foreclosed homeowner does or does not cancel. Indeed, nothing in the statutory text limits the bona-fide-purchaser proviso to a circumstance when the owner does not exercise his cancellation right, and the majority does not even try to identify a provision in the text that would do so. The majority's interpretation adds words to the statute, limiting the rights of a bona fide purchaser, that the Legislature has not supplied. "[W]e will not read into a statute a provision that the legislature has omitted, either

purposely or inadvertently." *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 911 (Minn. 2006) (per curiam).

Moreover, the majority's interpretation is far-fetched and contrary to common sense. Regardless of whether section 325N.17(f)(3) applies in this case, it must apply in *some* case. It is, after all, a legislative command that we construe every statute "to give effect to all its provisions." Minn. Stat. § 645.16 (2014); *see, e.g.*, *Jackson v. Mortg. Elec. Registration Sys., Inc.*, 770 N.W.2d 487, 496 (Minn. 2009). The majority suggests that the proviso applies to prevent a foreclosed homeowner from allowing the cancellation period to expire without cancellation, and then, because a prohibited transaction occurred, claim that its rights are superior to those of a bona fide purchaser. Such a scenario is too fanciful to be taken seriously. But even if a foreclosed homeowner were to attempt to carry out such a far-fetched plan, he would have no rights against the bona fide purchaser, even absent the proviso, because his transfer to the foreclosure purchaser would be valid and uncancelled, depriving him of any rights in the property. Accordingly, the bona-fide-purchaser proviso would be meaningless.

In sum, the majority's proposed interpretation is unreasonable and far-fetched. Section 325N.17(f)(3) applies when the foreclosure purchaser engaged in a prohibited transaction during the cancellation period, regardless whether the foreclosure purchaser timely cancelled the transaction, and the bona fide purchaser acquired its interest in the property without notice of a violation of sections 325N.10-.18. Accordingly, I conclude that the protections of Minn. Stat. § 325N.17(f)(3) apply to First Minnesota.

### III.

Next, the majority concludes that Graves's cancellation deprives First Minnesota of its rights as a bona fide purchaser under the statute, because a cancellation has the effect of "annul[ing] or invalidat[ing]" the quitclaim deed that Graves gave to Wayman, making it "a form of rescission" that represents "the unmaking or abrogation of a contract." *Supra* at 14. In short, the majority concludes that the cancellation rendered Graves's quitclaim deed "void," and there (in the majority's view) the matter ends. The majority ignores our case law and fails to take the next step in the legal analysis to determine whether a bona fide purchaser has rights against the unrecorded rights of a seller: the conclusion that a transaction is void marks the beginning, not the end, of the analysis in this case. In describing the rights of bona fide purchasers, we have long drawn a distinction between "void" transactions that are merely voidable and those that are void ab initio. Specifically, a bona fide purchaser is entitled to the protections of the Recording Act if he claims title from a transaction that is voidable, but not one that is void ab initio.

### A.

A transaction that is void ab initio is "of no legal effect" or "null," whereas a voidable transaction is "valid until annulled" and "capable of being affirmed or rejected at the option of one of the parties." *Onvoy, Inc. v. SHAL, LLC*, 669 N.W.2d 344, 353 n.9 (Minn. 2003) (citing *Black's Law Dictionary* 1568 (7th ed. 1999)); *see also Spartz v. Rimnac*, 296 Minn. 390, 394, 208 N.W.2d 764, 767 (1973) (explaining with regard to voidable, as opposed to void contracts, "that action is necessary in order to prevent the

contract from producing the ordinary legal consequences of a contract" (quoting Restatement of Contracts § 13 cmt. e (1932))).

On the one hand, transactions which a party originally intends to be valid but later seeks to cancel for various reasons such as fraud, misrepresentation, or mistake, are voidable. *See Dahlberg v. Young*, 231 Minn. 60, 67, 42 N.W.2d 570, 575 (1950) ("A deed which is procured through fraud or undue influence is not *void* but only *voidable*."); *Schaps v. Lehner*, 54 Minn. 208, 212, 55 N.W. 911, 912 (1893) (stating general rule that a contract entered into by an insane person is not void, "but at most only voidable"); *Cochran v. Stewart*, 21 Minn. 435, 438 (1875) (explaining that a contract of sale for personal property induced by fraud is not void, but voidable at election of vendor, and election must be made before fraudulent vendee sells to a bona fide purchaser).

Likewise, transactions that are rendered void because they did not comply with an applicable statute are generally considered voidable at the option of the aggrieved party, rather than void ab initio. *See Greer v. Kooiker*, 312 Minn. 499, 504-05 & n.2, 253 N.W.2d 133, 138 & n.2 (1977) (explaining that statute of frauds, which states that certain contracts "shall be void," actually renders them voidable (citing Minn. Stat. § 513.05 (2014))); *In re Sprain's Estate*, 199 Minn. 511, 514-16, 272 N.W. 779, 781 (1937) (holding that sale of property by interested personal representative in probate proceeding in violation of statute stating any sale "made contrary to the provisions of this section shall be void," was voidable rather than void ab initio); *Willard v. Finnegan*, 42 Minn. 476, 478-79, 44 N.W. 985-86 (1890) (holding that sale of property made contrary to statute providing that "if the mortgaged premises consist of separate and distinct farms or

tracts, they shall be sold separately," was voidable rather than void ab initio); *White v. Iselin*, 26 Minn. 487, 489, 493, 5 N.W. 359, 360, 364 (1880) (holding that sale of minor's property by minor's interested guardian, in violation of statute stating that any sale "made contrary to the provisions of this section shall be void," was voidable rather than void ab initio).

A voidable transfer of title does not defeat a bona-fide-purchaser's rights. *See First Fiduciary Corp. v. Blanco*, 276 N.W.2d 30, 33 (Minn. 1979) (finding when transaction was merely voidable, not void ab initio, a bona fide purchaser was entitled to protection); *In re Sprain's Estate*, 199 Minn. at 514-15, 272 N.W. at 781; *White*, 26 Minn. at 493, 5 N.W. at 364; *see also Bausman v. Faue*, 45 Minn. 412, 417, 48 N.W. 13, 16 (1891) (distinguishing "on the matter of estoppel between a deed that is void and one that is only voidable, holding that the latter may and the former may not be the basis of estoppel").

On the other hand, transactions in which the deed is forged or lacks a required signature are void ab initio, or void from the beginning. *See Dvorak v. Maring*, 285 N.W.2d 675, 677 (Minn. 1979) ("[W]ithout the signatures of both spouses a conveyance of homestead property is not merely voidable but is void and the buyer acquires no rights whatsoever."); *Blanco*, 276 N.W.2d at 33 ("Where a deed to a homestead is not executed by one of the spouses, the transfer is wholly void, not merely voidable, regardless of the equities of the matter."); *Bausman*, 45 Minn. at 417, 48 N.W. at 15-16 ("[W]here a deed was stolen from the grantor . . . or the grantee had altered the deed so as to make it void, a *bona fide* purchaser was in no better condition than his grantor."). A deed that is void

D-14

ab initio transfers no interest and cannot pass title even in favor of a bona fide purchaser. *See White & St. Townsite Co. v. J. Neils Lumber Co.*, 100 Minn. 16, 22, 110 N.W. 371, 374 (1907) (because deed purporting to transfer title was "void, not simply voidable," given that grantor "had no power" to convey because he never "acquired any title," it was "immaterial" whether a subsequent purchaser was bona fide); *Bausman*, 45 Minn. at 417-18, 48 N.W. at 15-16.

When Graves exercised the statutory right of cancellation pursuant to section 325N.13, he rendered the transaction between him and Wayman of no legal effect as between them. But if he had never cancelled, the transaction would have been valid and enforceable between Graves and Wayman. A transaction that is "valid until annulled" and can be "affirmed or rejected at the option of one of the parties" is voidable, rather than void ab initio. *See Onvoy*, 669 N.W.2d at 353 n.9. Indeed, that is its defining characteristic. Accordingly, such a transaction carries with it the protections in favor of a bona fide purchaser set forth in the Recording Act, Minn. Stat. § 507.34 and the corresponding protections in sections 325N.17(f)(3) and 325N.18, subdivision 3.

B.

The majority attempts to blur these distinctions with the glib statement that "[n]othing plus nothing still equals nothing." But as we have seen, in the field of bona fide purchasers, there are degrees of "nothing": an agreement that is void ab initio was, in a sense, *always* nothing, while an agreement that is merely voidable *becomes* nothing only at the option of a party. The latter type of transaction, we have long held, passes an interest that can be protected in favor of a bona fide purchaser even if a party later

chooses to void it. Indeed, both the majority's analysis of the meaning of the term "cancel," and its analysis of cancellation as a form of rescission, support the conclusion that the transaction was voidable, rather than void ab initio.

First, the majority notes that "cancel" means "to annul or invalidate." But as described above, our case law clearly states that a transaction that is "valid until annulled" is voidable, not void ab initio. The majority also points out that to "annul" means "to . . . declare void or invalid." But while the majority emphasizes the word "void" in the latter definition, the important word is actually "declare." A cancellation *declares* a contract void; but a transaction that is void ab initio is *always* void, and neither the parties nor anyone else can ever have any rights under it, regardless of their declarations. "The practical distinction between a deed voidable and one wholly void is that the former may be ratified . . . while a deed wholly void is incapable of ratification." *Law v. Butler*, 44 Minn. 482, 485, 47 N.W. 53, 54 (1890); *see also Logan v. Panuska*, 293 N.W.2d 359, 362 (Minn. 1980) (as between "voidable" and "void" contracts, "only a voidable contract can be ratified or confirmed"); *Dayton v. Nell*, 43 Minn. 246, 248, 45 N.W. 231, 232 (1890) ("[A]cts absolutely void cannot be ratified, while those that are voidable merely may be.").

Second, the analogy of Graves's cancellation to a right of rescission also supports the proposition that the transaction between Graves and Wayman was voidable. Our cases make clear that a right of rescission is relevant only for voidable contracts, not those void ab initio. Thus, in *Mlnazek v. Libera*, we stated that a contract induced by fraud "is not . . . as a rule, void, but only voidable at the election of the defrauded party,"

and the defrauded party has the "election of two remedies," namely rescission and damages. 83 Minn. 288, 291, 86 N.W. 100, 101 (1901); *see also Hatch v. Kulick*, 211 Minn. 309, 310, 1 N.W.2d 359, 360 (1941) ("A contract [induced by fraud] is voidable. The victim may affirm and, keeping what he has received, sue at law for what damage he has sustained by reason of the fraud. Or he may, in equity or by his own act, rescind the tainted contract . . . ."); *McQueen v. Burhans*, 77 Minn. 382, 393, 80 N.W. 201, 205 (1899) (Mitchell, J., concurring) (discussing "the subject of the rescission of voidable contracts").

Although the majority cites numerous cases that stand for the proposition that rescission thoroughly unmakes a contract *between the parties*, none of those cases suggest that rescission deprives a potential bona fide purchaser of any rights it may have acquired in a chain of title from one of the parties. In *Abdallah, Inc. v. Martin*, 242 Minn. 416, 65 N.W.2d 641 (1954), the question was whether a buyer's actions in returning defective goods constituted a rescission. We held that it did not, because the return of defective goods could be consistent with an award of damages under the contract. In *Brown v. Calif. & W. Land Co.*, 145 Minn. 432, 177 N.W. 774 (1920), the question was whether defendants' offer of performance, made after plaintiffs had rescinded, was effective; we held that it was not, because after plaintiffs had rescinded, there was nothing to perform. In *Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc.*, 308 N.W.2d 490 (Minn. 1981), the question was whether a party who had rescinded could nevertheless enforce a waiver of defense provision in the rescinded contract; we held that

the whole contract was rescinded. In none of these cases was a third party's rights even at issue.

In sum, the cases cited by the majority are singularly unhelpful to the issue at hand. No party disputes that Graves's cancellation returned Graves and Wayman to their pre-existing rights *with regard to each other*. Rather, the question is whether the unrecorded cancellation deprives a bona fide purchaser of *its* rights. For the reasons described above, I conclude the Legislature clearly answered the question in the negative.[10]

C.

The majority also claims to find support for its theory that cancellation extinguishes a bona fide purchaser's rights in the requirement at common law that a deed be delivered to be valid. It is true that our cases at common law have stated that "delivery of a deed is essential to a transfer of title," *Slawik v. Loseth*, 207 Minn. 137, 139, 290 N.W. 228, 229 (1940), and that "delivery of a deed is complete only when the grantor has put it beyond his power to revoke or reclaim it." *Babbitt v. Bennett*, 68 Minn. 260, 263, 71 N.W. 22, 22 (1897). We have also held, in a different situation, that an

---

[10] The majority argues that the distinction between transactions that are void ab initio and those that are merely voidable is not relevant to this case because First Minnesota did not rely on it. But the interaction between a foreclosed homeowner's rights and the rights of a bona fide purchaser is at the heart of this case, both on the majority's account and on the dissent's. And under our well-established case law, we cannot assess the parties' respective rights without inquiring whether Graves's sale to Wayman was void or merely voidable.

undelivered deed is void ab initio, not merely voidable. *White & St. Townsite Co.,* 100 Minn. at 22, 110 N.W. at 374.

How the common-law delivery rule applies to a statutory right of cancellation such as the one in Minn. Stat. § 325N.13 is a potentially interesting question. Delivery is primarily a question of fact depending on the intent of the parties. *Exsted v. Exsted*, 202 Minn. 521, 525, 279 N.W. 554, 557 (1938) ("Whether or not there has been a delivery is a question of fact."); *Babbitt*, 68 Minn. at 262-63, 71 N.W. at 22 ("Delivery is a question of fact, and is mainly and primarily one of the intention of the grantor."). We have never addressed whether a party who has the intent to deliver a deed, but is prevented by operation of statute from doing so, has "delivered" the deed. I am aware of no authority holding that delivery of a deed was ineffective because the transaction was subject to a statutory right of cancellation.[11]

The question is academic with respect to the cancellation right set forth in section 325N.13, however, because the Legislature has clearly abrogated the common-law delivery rule insofar as it applies to transactions during the cancellation period. Specifically, the common-law delivery rule is inconsistent with any conceivable reading of Minn. Stat. § 325N.17(f)(3). Section 325N.17(f)(3) is triggered by a foreclosure purchaser "transfer[ing] or encumber[ing] or purport[ing] to transfer or encumber any

---

[11] The parties did not address this issue before this court, and the district court made no findings of fact regarding it—understandably, because the parties apparently did not believe the delivery rule was relevant to the issues in this case and therefore have never mentioned it.

interest in the residence in foreclosure to any third party" before "the time during which the foreclosed homeowner may cancel the transaction has fully elapsed." Application of the common-law delivery rule to chapter 325N would render any transaction during the cancellation period completely ineffective, because so long as the cancellation period has not yet expired, the foreclosed homeowner has not yet put the deed "beyond his power to revoke or reclaim." *See Babbit*, 68 Minn. at 263, 71 N.W. at 22. But the obvious intent and effect of the proviso in section 3252N.17(f)(3) is to protect a bona fide purchaser without notice, notwithstanding that the bona fide purchaser's title derives from a transaction that occurred when the foreclosed homeowner had a statutory right to reclaim the deed. The protection for a bona fide purchaser's rights that the Legislature explicitly provided for this situation is therefore flatly inconsistent with the common-law delivery rule.

IV.

Finally, the majority faults my approach because, under it, Graves "did everything he was required to do under MHOEPA, yet would still lose his home." *Supra* at 22. Underlying the majority's reasoning is the implicit assumption that if Graves had not become involved in the transaction with Wayman, or if Wayman had reacted lawfully to Graves's cancellation, then Graves would have kept his home. As the majority seems to recognize, *see supra* Part II.B., the record demonstrates the falsity of this assumption. The district court found that Wells Fargo had already foreclosed on Graves's home, and he was facing a deadline of September 13, 2007, to redeem, when Wayman approached him less than a month before the deadline. Graves had already attempted, unsuccessfully,

to secure financing to redeem the property. Graves had "received various offers for his interest in the home, including one for $15,000.00," but he rejected them because they would not have preserved his ability to stay in his home.

In short, there is no reason to believe that absent Wayman's involvement, Graves would still be in his home. If Wayman had never come onto the scene, or had responded lawfully to Graves's cancellation, Graves would still have lost his home, not as a "penalty or obligation" imposed by the cancellation, *see* Minn. Stat. § 325N.14(a), but as the result of the prior foreclosure by Wells Fargo and Graves's own inability to redeem.

To be sure, Wayman defrauded and harmed Graves. The district court found that as a result of his dealings with Wayman, Graves lost the equity that he had in the home, and unnecessarily made rent payments to Wayman pursuant to Wayman's fraudulent scheme. But the district court accounted for all these losses and awarded exemplary damages to Graves in the amount of one and one-half times his actual damages, providing a substantial remedy for his losses (an award that the majority allows to stand).

V.

By enacting Minn. Stat. §§ 325N.10-.18, the Legislature provided protections for foreclosed homeowners such as Graves. But in protecting foreclosed homeowners, the Legislature did not intend to overrule more than a century of other protections in favor of bona fide purchasers. Instead, it explicitly incorporated those protections into the statute. Those protections allow real estate markets to work smoothly, providing assurances to purchasers that they have good title when they purchase property that has been involved

D-21

in a foreclosure.[12] Here, the majority makes those protections meaningless. And because a foreclosure purchaser's failure to provide a contract that complies with sections 325N.10 to 325N.15 extends the cancellation period until the last day that a foreclosed homeowner has a right to redeem, the majority's opinion calls into question the title of a foreclosed property throughout the redemption period. The majority's approach creates disincentives for reputable purchasers to make loans for properties in foreclosure, thereby making it harder for homeowners in foreclosure to sell their property.

For these reasons, I respectfully dissent.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Dietzen.

WRIGHT, Justice (dissenting).

I join in the dissent of Justice Dietzen.

---

[12] The majority remands the case to the district court "to determine whether First Minnesota has an interest in the property based upon equitable principles," apparently in an attempt to soften the blow of the inequitable treatment it visits upon First Minnesota. The majority does not suggest any basis upon which First Minnesota could be entitled to equitable relief, and therefore I suspect the prospect of relief on such grounds is illusory.